407 So.2d 827 (1979)
Charles BRACEWELL, alias,
v.
STATE.
4 Div. 646.
Court of Criminal Appeals of Alabama.
January 30, 1979.
Rehearing Denied February 20, 1979.
*829 Griffin Sikes and John B. Givhan, Andalusia, for appellant.
William J. Baxley, Atty. Gen. and Elizabeth N. Petree, Asst. Atty. Gen., for the State.
HARRIS, Presiding Judge.
Appellant was indicted by the grand jury of Covington County for robbery during the commission of which the victim was intentionally killed, as delineated in Code of Alabama 1975, Section 13-11-2(a)(2). Two attorneys were appointed to represent appellant and he was arraigned in their presence, pleading not guilty to the indictment. After a two-day trial, the jury returned a verdict of guilty as charged in the indictment. Subsequently, the trial court heard evidence on mitigating and aggravating circumstances, adjudged appellant guilty and set forth written findings of facts to support the imposition of the death penalty. Trial counsel were appointed to represent appellant before this court and appellant was provided a free transcript.
Marie Carnley testified that she was the widow of the deceased, Rex Carnley, who had been engaged in running a store near Opp, Alabama, in Covington County, until he died on Monday, August 15, 1977. On the preceding afternoon, the deceased left home and went down to his store to spend the night as he had been having burglaries in the past few months. At the time the deceased was carrying a billfold in which he had seventeen or eighteen hundred dollars. Mrs. Carnley and their three sons subsequently went to the store that evening and locked the deceased inside the store at closing time, 8:00 p. m., using a padlock on the front door. Mrs. Carnley had observed cash in denominations of ones, fives, tens and twenties in the store's cash register before leaving the store. After her husband's death, Mrs. Carnley received his personal effects; however, the deceased's wallet was not among them and Mrs. Carnley did not find it or its contents later at the store.
Marlon Brewer, employed by the Alabama Bureau of Investigation, testified that he went to the deceased's store on the morning of August 15, 1977, where he observed the body of the deceased on the floor of the store. Brewer noted that there was no billfold on the body and also observed a pistol at the side of the deceased.
Johnny Harrelson testified that on Monday morning, August 15, 1977, around 6:00 a. m., he stopped at the deceased's store to get gas. There he saw lights on in the store; however, the gas pumps were not running. Harrelson discovered deceased's body when he entered the store to have the pumps started and then called the Opp Police Department. Harrelson remained at the store until the police arrived.
Jerry Brannon, Chief of the Opp Police Department, testified that the police radio log showed that at 6:17 a. m. on August 15, 1977, a call stating that the deceased had been shot was received. Brannon further testified that he participated in the subsequent investigation of the report.
John Ellis, an Opp police officer, testified that he went to the deceased's store following a dispatcher's radio call. Ellis observed deceased's body lying on the floor. Subsequently, Ellis identified deceased's body to the coroner at the funeral home.
George Szpek, a deputy in the Covington County Sheriff's Department, arrived at the deceased's store at approximately 7:30 a. m., on August 15, 1977, and participated in the investigation of deceased's death. Szpek testified that he examined deceased's body and found no billfold. Szpek observed only loose change and checks in the till of the store's cash register.
*830 Richard Roper, a toxicologist with the State of Alabama, Department of Toxicology and Criminal Investigation, was qualified as an expert, and he testified that he conducted a postmortem examination of the deceased's body on August 15, 1977, at Rainer's Funeral Home in Opp, Alabama. Roper noted multiple gunshot wounds to the deceased's head and testified that in his opinion death occurred as a result of acute central nervous system trauma and intracranial hemorrhage subsequent to the gunshot wounds. In all, there were nine gunshot wounds to the body.
Roper recovered several projectiles and projectile fragments which he delivered to Dale Carter of the Enterprise Division of the Toxicology Department. Additionally, Roper gave Carter powder and blood scrapings from the chest and face of the deceased.
On cross-examination Roper testified that the caliber of the projectiles removed from the deceased's body was .22. He stated that in his opinion death occurred between 3:00 a. m. and 5:00 a. m., August 15, 1977.
Richard Dale Carter, a criminalist with the Alabama Department of Toxicology and Criminal Investigation, testified that he went to the deceased's store on August 15, 1977. There he found a Herrington and Richardson, .22 caliber, nine-shot revolver lying on the floor to the right of the deceased's body. Nine expended cartridges were in the chamber of the weapon. Carter test-fired the revolver found at the deceased's side and compared those projectiles with the projectiles received from Roper. In Carter's opinion, four of the projectiles received from Roper were fired from a weapon having identical class characteristics, e.g. rifling, as the Herrington and Richardson recovered at the scene of the deceased's body. The remaining projectiles were too mutilated or damaged to allow a comparison to test-fired projectiles. Blood scrapings taken from the chest and face of the deceased contained particles of gunpowder.
Eddie Robertson testified that he had helped "raise" appellant and that he had known him all his life. Robertson lived seven miles from Samson in the direction of Opp. Robertson saw appellant on the evening that the deceased was killed. At that time appellant told Robertson that "he got out of Opp on account of that boy got killed up there and they would be up there to pick him up." Appellant told Robertson's wife that "they" had not done it.
W. E. Harrell, the Sheriff of Covington County, testified that he had known appellant four or five years. Harrell first spoke to appellant concerning the death of Rex Carnley, on November 2, 1977, in the Coffee County Jail and then again on that same date in the Covington County Jail.
Outside the hearing and presence of the jury, Harrell testified that he arrested appellant at the Coffee County Jail on another charge. En route to Covington County, Harrell told appellant that he was suspected of killing the deceased and advised him of his "Miranda" rights. Having been advised of these rights, appellant stated that he understood them. No one threatened or coerced appellant to make a statement, or offered appellant any reward or hope of reward for making a statement. Appellant then told Harrell that he had no knowledge of deceased's death. Harrell testified that he "just didn't pursue it any further at that time."
On Friday, November 4, 1977, Harrell testified someone informed him that appellant wanted to talk to him. Subsequently, Harrell saw appellant in the sheriff's office at the Covington County Jail. There, in the presence of Harrell's wife, appellant told Harrell that he wanted to tell him about Rex Carnley. Harrell told appellant that, before appellant told him anything, he wanted to advise appellant of his rights again, which he did. Responding that he understood his rights, appellant began to make a statement. From the record:
"Q. If you would just tell us Sheriff what he told you at that time with reference to the Rex Carnley murder?
"A. Okay. Charles appeared to be very nervous. I handed him a cup of coffee and asked him to have a seat. He sat *831 down and said, I want to tell you the truth about Rex Carnley. I told him before he told me anything I must advise him of his constitutional rights again, which I did. He then said he wanted to get right with God and that the only way he could do that was to tell the truth about everything. He said that he and Debra did go to Rex Carnley's store about four or five o'clock in the morning on August the fifteenth, 1977, with the intention of robbing him. He said that they drove past the store a few times before he saw any lights on in the store. And then, just before five o'clock they saw the lights on in the store. He said that he stopped the car near the gas pumps and got out and walked to the front door. He stated that he had a pistol and Debra knocked on the door. When Rex opened the door they both went inside and he pointed the pistol at Rex and told him that he wanted his money. He said that Rex had his hands up and his back to the counter. Debra went behind the counter and got a pistol from under the counter and shot Rex in the back of the head. He said that he took the gun from Debra and shot Rex several more times in the face. And he said that while Rex was lying on the floor that he turned him over and shot him again in the back of the head. He said that they removed a wallet from Rex's body and left the store. After Charles related this story to me, I called Sergeant Brewer and he came to the jail and Charles related a similar story to him in my presence."
Harrell further testified that appellant related his story three times that night: twice to him, and once to Sergeant Brewer. Again, appellant was advised of his rights, before he made his statement to Brewer. Harrell talked to appellant again a few days later.
On November 21, 1977, Harrell again advised the appellant of his rights and took another statement from him. The District Attorney, Mr. McGill, Barbara Blackwell and Marlon Brewer were also present. Subsequent conversations were held with appellant on November 22, 1977; December 2, 1977; January 14, 1978; January 17, 1978; January 19, 1978; January 23, 1978; and January 25, 1978. On each of these occasions appellant made a statement, having been advised of his constitutional rights prior thereto. The last of these statements was reduced to writing and signed by appellant. It is set out below.
"Date January 25, 1978
"STATEMENT OF Charles Bracewell
"Date of Birth: March 1, 1951
"Charles Bracewell was interviewed by the Sheriff, W. E. Harrell, in his office, in the presence of Barbara Blackwell.
"Charles Bracewell was asked to describe the billfold that was removed, and that was in his possession at one time, from the body of Rex Carnley on the morning that Rex Carnley was shot in his place of business on Highway 84 East, just outside of Opp, Alabama.
"Charles Bracewell described the billfold as follows: It was a prison made billfold with lace on the outside. It was dark brown, and it was laced around the edges in black. It was a medium size, regular billfold made of genuine leather.
"This is a true and correct statement to the best of my knowledge. I have not been promised any reward or hope of reward. I have not been harmed or threatened in any way."
Harrell testified that on November 21, 1977, appellant related substantially the same story told on November 4; however, appellant stated that he took the murder weapon, wiped the prints from it, and placed it on the counter. Two days later, appellant told Harrell that he had placed the weapon beside the deceased's body. Appellant also gave two versions of what happened to the deceased's billfold. First appellant stated that he and his wife had burned the wallet. Subsequently, appellant told Harrell that his wife had put the billfold in a closet in her mother's house in Elba, Alabama. Then appellant again told Harrell that the wallet had been burned.
*832 Appellant objected to the admissibility of each of the statements, which objections the court overruled. Back in the presence of the jury, Harrell related appellant's statements to him.
Again, outside the presence of the jury, Harrell related that he received a note from appellant on March 8, 1978. This note is set out below:
"Sheriff,
"When Mr. Ward was jailor here he took a moon pie box from me. He gave it to you. The box has 2 pictures of my wife in it and some old letters she wrote me and a ring. If you will return this box and stuff to me I will be thankful to you and I promise you I'll go to court without causing you any trouble.
"I would be thankful if you would tell Jerry to give me my stuff so I can send it home. I would also be thankful if you let me visit my wife this weekend cause I won't get to see her no more. You are the boss but if you will do this I promise you I will go to court without causing you any trouble. I will be thankful to you. That box means a lot to me.
"Charles Bracewell"
Harrell then went to the jail where he retrieved a moon pie box from the property box. Inside was a four-page letter, which is set out below:
"Tear this up as soon as you read it. Flush it down the commode.
"Dear Darling,
"I know you blame me for you being locked up. You believe what you want to but when Jimmy's wife and Martha told the law you said we killed Rex Carnley that's what got the law checking up on us. Since then they found out for sure that a man and woman killed Rex Carnley. They know the man was my size and the woman was your size. You can believe what you want to but they are going to prove we killed Rex Carnley and I am trying to help you. They might decide to let me take it all on myself. You tell them you went to Rex Carnley's store with me but you sat in the car while I shot him. We know this is not true but this way they might believe you didn't have anything to do with killing him all you did was sit in the car and you never got out.
"If we both get time for this Debra you will probably get 10 years I will probably get 15 years but if you want me to try to take it all on myself I will, but if I take it all on myself they will give me a life sentence.
"You write me a letter and get a different jailer to bring it to me. I never got but one letter from you. I want you to answer all my questions and tell me the truth. If you want me to take it all on myself you write and tell me. Don't tell me no lie about nothing.
"I have never had you locked up, Debra, but if I get you out of this and you mess me up I promise you on a stack of Bibles I'll do everything I told you I would in my letters, cause you will deserve it.
"I love you, Debra, and I don't want you locked up. I tried to get them to kill me in the electric chair and let you stay free on the streets. I can't help whether you believe me or not. You know yourself, Debra, that if you was married to any other man and treated him like you have treated me he would done have forgot you and told the law to do what they wanted to with you.
"I should try every way I can to hurt you like you hurt me. I should witness against you in Florida and everywhere and tell you to let your family get you out of it. To hear you tell it your family love you more than I do and they are the ones that done everything for you. Nobody in your family would go to the electric chair for you. Your family loved you till you got in trouble then they forget you. After they found out you could get out of trouble they loved you again.
"You know I never done anything to your family. I wouldn't even testify against your daddy. You must have told them things on me to make them hate me. If you did you tell them the truth. I understand if you told them things on me to *833 keep your people from hating you. If they love you tell them the truth and they won't hate you. If you threw my ring away and pictures tell me the truth.
"If you live for God you wouldn't want to go to dances and places. You would want to go to church and write me and come see me. You would want to keep your promises that you made to me and God. I told you baby that God would let the devil punish you for treating me wrong. You knew God would not let you do me wrong and get away with. God knows everything wrong that you did to me. God will forgive you and I will too if you tell both of us the truth about everything. No matter how bad it hurts me I want to know everything you done wrong to me since I been locked up. Love your husband Charles I love my wife Debra forever. love Charles."
Jerry Newton, the chief jailer of the Covington County Jail, testified outside the presence of the jury that he delivered a note from appellant to Sheriff Harrell in March of 1978. Subsequently, Newton unlocked the property bin and gave Harrell the box referred to in appellant's note. This box had been received in January of 1978 and had been in the property bin until March of that year.
Parker Ward, a jailer at the Covington County Jail, testified that appellant gave him the box in question to deliver to his wife. Being short of time, Ward locked the box in the property bin where it remained until March.
Back in the presence of the jury, Harrell read about the note requesting the relation of the box previously introduced in evidence. Harrell also related his testimony given in voir dire examination. Additionally, Parker Ward, James Cook, Faye Harrelson, Johnny Coffer and Ray Humphrey, all employees at the Covington County Jail, testified that the box which had been placed in the property bin had not been tampered with. The District Attorney then read appellant's letter to his wife to the jury.
Jerry Newton testified that there is an intercom system from sections of the jail connected to the front desk. A week and a half prior to trial, Newton heard, through the intercom, appellant tell his wife that "if she hadn't shot him, we wouldn't be in this mess that we are in now."
Mrs. Harrelson testified that she had heard over the intercom appellant shout to his wife that there was no point of her being afraid of the matron when she shot and killed a man.
Nicky Carnley, deceased's son, testified that his father owned two pistols. One of these weapons was a Herrington and Richardson nine-shot, 22 caliber revolver. Carnley examined a Herrington and Richardson pistol shown to him and identified it as having been his father's.
Outside the presence of the jury, Marlon Brewer testified that he was a criminal investigator with the State of Alabama. On January 23, 1978, Brewer was present in the Covington County Sheriff's Office when appellant made an oral statement. Also present were the District Attorney and Sheriff W. E. Harrell. Before the interview began, Harrell advised appellant of his constitutional rights. At the conclusion of this oral interview, Brewer was present when appellant's statement was reduced to writing. At this time Brewer advised appellant of his constitutional rights. Appellant stated that he understood each of his rights and that he was willing to make a statement. Appellant also signed a written waiver of rights. Brewer further testified that appellant was not threatened or coerced to secure a statement. Neither was appellant offered a reward or hope of reward in exchange for giving a statement. At that time appellant's statement was transcribed by a secretary, appellant reading it upon its completion and making and initialing certain changes. Over objection of appellant that the confession was not voluntary, the written statement was introduced into evidence.
Back in the presence of the jury, Brewer reiterated his voir dire testimony. The District Attorney then read appellant's written statement to the jury. It is set out below:

*834 "MR. McGILL: The statement is dated January the twenty-third, 1978, Statement of Charles Bracewell. And I am not going to read the introductory part. I am just going to read what is in quotations.
"`On Sunday, August 14, 1977, at approximately 10:00 p. m., me and Debra were at my grandmother's house (Ira McLeod) on West Hart Avenue, Opp, Alabama. We left there and went to Eddie Robinson's house near Samson. When we got there, Eddie, his wife, their children, and his sister-in-law, Mabel Cordell, and Bobby and Nell Moore were there. We were traveling in my white 1956 Chevrolet. We stayed there for approximately one and one-half hours.
"`When we left there, we went to my sister's house in Samson. We pulled into the back yard and I went to the back door and knocked and didn't get any answer. I think my sister had already gone to bed. Me and Debra sat in the car and talked a few minutes.
"`Debra wanted to know if I knew if there was anyone in Samson we could get some money from. I told her I didn't know of anyone. We left there and went to Peery and parked on the river bank where the old tressle and iron bridge are just outside of Samson. We sat there and talked for some time.
"`Debra wanted to go to her mother's house in Elba, but I told her it was too early. Finally, we decided we would leave and drive slow and go through Opp on the way to her mother's house. We drove through Opp to the Gulf Station and turned right and got on U. S. Highway 84 going to Elba.
"`When we passed Rex Carnley's store, Debra told me, "there's somebody that keeps a lot of money and he's up." There was a light on in the store. Debra said, "he usually keeps from $1,000 to $1,700." I pulled off the side of the road and turned around and drove back passed Rex Carnley's store. Just below the store I pulled off the road again. Me and Debra sat there and talked.
"`I told her that Rex knew me. She said, "well, let's figure a way to do it." We talked about ways to do it. I told her the only way to do it was for her to go up to the door, because I knew Rex would know me and that I'd hide, until she got him to the door. After it was decided, I turned around and drove back to the store, and parked the car headed toward Elba in front of the store.
"`When I got out of the car, I had my gun in the waistband of my pants. It was a 22 revolver. When we got to the door, Debra knocked on it and I stood sideways beside the door. Rex came to the door and pulled it open. It did not appear to be locked. I stepped around and was holding the gun on him. We went inside.
"`I backed Rex over to the counter and Debra had gone behind the counter. I stood facing Rex with the gun on him talking to him. I told him, "do what I tell you to do, we don't want to hurt you. All we want is your money." Rex said, "I don't see why you want to rob me when I have offered you $100.00 to go to bed with me". He was looking back over his shoulder when he was saying this.
"`Then he turned back and looked at me. I saw Debra with a gun standing back behind the counter behind Rex. After Rex said this, he looked back at me. A shot was fired. Debra had shot him in the back of the head. When I glanced at Debra, she must have been standing on the rung of the stool, because she was as tall as Rex. Rex slumped partially to the floor, and then fell backwards.
"`I moved towards Debra and took the gun. At this time, Rex was trying to get up like he was trying to get to Debra. I shot him in the face five or six times. Rex fell back on the floor on his back. I handed the gun to Debra and then I turned Rex over. Debra told me to move and as I moved around, Debra shot Rex in the back of the head two more times.
"`I took the gun and Debra took Rex's billfold from his back pocket. I wiped off the gun and laid it beside Rex. And Debra had gone on to the car. Then I *835 went to the door and wiped the door knob off and went to the car.
"`We left there and went back to my grandmother's. While we were there Debra changed clothes and I counted the money she had given me on the bed. To the best of my memory there was $427.00. I kept $200.00 and give her the rest. I put the billfold in my back pocket. We left granny's and went to Highway 52 back to Peery near Samson.
"`When we got to the river, we drove down near the mouth and parked. I was cleaning out the car and I handed the billfold to Debra and told her to get rid of it. She left and walked toward the river with the billfold.
"`When she came back, she said, "you don't have to worry, no one will ever find that billfold." We left there and went to my sister's house in Samson. It was after daylight, but still early. I talked to my sister about getting a job at the factory. It was early, before 7:00 a. m., because she was getting ready to go to work. I had read a lot of detective stories so I borrowed $2.00 from my sister for gas. So, I would have an alibi that I didn't have any money.
"`About 8:00 a. m., Debra and I went to the sewing factory in Samson and both made application for jobs there. When we left there, we went back to Eddie Robinson's house. There was no one home but Mabel and Eddie's kids and Ondas Paul. We stayed there until after Eddie and Inez came in from work in the afternoon.
"`I told Eddie that we were going to have to go to Florida because Rex Carnley had been robbed and killed and the law would be looking for us. We went back to my granny's and spent the night. We left the next morning and went to Florida and stayed for four or five days.
"`The above is a true and correct statement that I have given on my own free will without threat or promise. Signed, Charles Bracewell
"`This is to certify that on twenty-third January 1978, Charles Bracewell, known to me, did read and swear that the foregoing was a true and correct statement. Signed, Barbara Blackwell, Notary Public.'"
"This concluded the evidence in the State's case. Appellant moved that the evidence against him be excluded on the ground that the corpus delicti was not proved. This motion was denied.
Appellant called deceased's wife for further cross-examination. She testified that she had been married to the deceased for twenty-two years. Although Mrs. Carnley and her husband had separated and filed for divorce, they had reconciled. Briefly put, the Carnleys' marriage had been a stormy one. After entering Mrs. Carnley's petition for divorce, a restraining order against the deceased, and the divorce decree into evidence, appellant rested his case.
Following deliberation, the jury returned a verdict of guilty as charged. The trial court then set a date for the sentencing hearing required by the Alabama death penalty law.
At the sentencing hearing the State introduced into evidence judgment entries against appellant in two second degree burglary cases and one robbery case, all from Covington County. Additionally, a Florida judgment from DeFuniak Springs for burglary and grand larceny against appellant was introduced. Furthermore, two judgment entries on kidnapping and robbery from Geneva County were admitted into evidence.
David Ganey testified that he was an investigator for the District Attorney's Office and that he was present in Coffee County when appellant pled guilty to charges of burglary in the second degree.
Charles Finley Ham testified that he had known appellant for four years, having first met him in Draper Prison. While at Draper, Ham testified, appellant related the following to him:
"A. Well, he come up to me one time and said, wouldn't you like to live in them days? And I said, what you talking about? He said, back with Bonnie and *836 Clyde. Wouldn't you like to live back along when they were robbing? And I said, no. He said, I would. I think I would like to have me a woman and live back then and rob, and took after them, and be like Dillinger.
"Q. He said all of that?
"A. Yes, sir.
"Q. Did he say anything along this line on more than one occasion?
"A. Oh, a time or two. I don't remember. I didn't pay that much attention to it, unless he really drawed me to it. He would come up and seem like he would be excited."
Sheriff Harrell testified that jail records reflected that appellant was arrested on a fugitive warrant for parole violation on December 12, 1974. In 1975, Harrell arrested appellant following a report that appellant was threatening to shoot his brother, James Bracewell. Appellant was released into the custody of the Board of Pardons and Paroles.
Appellant testified at the sentencing hearing that Ham's testimony was correct; however, Ham had also joined in these conversations. Further, when Ham had visited appellant at the Covington County Jail, Ham told appellant that his sister had killed Carnley and that he was worried about taking a lie detector test. Appellant denied any involvement in the death of Rex Carnley.
Upon questioning by the trial court, appellant answered that he was twenty-seven years old and that he had completed the seventh grade. Appellant's parents died when he was fifteen.
After completion of testimony and a recess, the following occurred:
"THE COURT: All right. Defendant, Charles Bracewell, will come around, please, sir. (At which time, the Defendant approached the bench with his counsel, Honorable Griffin Sikes and Honorable John Givhan.)
"THE COURT: Mr. Bracewell, you were present in Court throughout the course of your trial before the jury and you heard the jury return their verdict, finding you guilty as charged and fixing your punishment at death, did you not?
"DEFENDANT: I did.
"THE COURT: And then you were present Friday, in which we held a hearing for the purpose of determining existing mitigating and aggravating circumstances, were you not?
"DEFENDANT: I was.
"THE COURT: You have anything to say before I pronounce the judgment of the law, and the sentence of the Court upon you?
"DEFENDANT: Yes, sir. I sure do.
"THE COURT: All right, sir.
"DEFENDANT: If I am going to get life without parole, I would rather have the electric chair.
"THE COURT: All right. The Court will enter the following judgment in this case: CC-78-27, State of Alabama versus Charles Bracewell. This cause having been tried on the fifteenth and sixteenth days of March, 1978, and a jury composed of Calvin H. Warren and eleven others returned the following verdict: `We, the jury, find the Defendant guilty as charged and fix his punishment at death. Calvin H. Warren, Foreman.'
"Thereupon the Court set a hearing on the seventh day of April, 1978, pursuant to Alabama law for the purpose of determining whether or not the Court would sentence the Defendant, Charles Bracewell, to death or life imprisonment without parole.
"Upon the conclusion of the hearing on April the seventh, 1978, the Court took the matters presented under submission and notified the Defendant, Charles Bracewell, his attorneys of record and the District Attorney who were all present in Court and who all have been present in Court at every stage of these proceedings, that the Court would announce its decision on April the tenth, 1978.
"The Court having considered the evidence presented on the trial of this case on March the fifteenth and sixteenth, 1978, the verdict of the jury returned on *837 March the sixteenth, 1978, the evidence presented on hearing on April the seventh, 1978, and the applicable law of Alabama finds the following aggravating circumstances:
"One. That the Defendant, Charles Bracewell, did intentionally kill Rex Carnley in the perpetration of a robbery or attempt thereof of the said Rex Carnley.
"Two. That the Defendant, Charles Bracewell, was previously convicted of the felony offenses of kidnapping and robbery which said felonies involved the use or threat of violence to the person.
"Three. That the Defendant, Charles Bracewell, committed the capital felony with which he is charged in the commission of a robbery.
"Four. That the Defendant, Charles Bracewell, committed the capital felony with which he is charged for pecuniary gain.
"Five. That the Defendant, Charles Bracewell, committed an especially heinous, atrocious, or cruel capital felony in that the deceased, Rex Carnley, was shotexecution styleat least eight times in the head or face.
"The Court further finds that the evidence reveals no mitigating circumstances.
"It is therefore Ordered and Adjudged that the Defendant, Charles Bracewell, is guilty of the aggravated offense of robbery or attempt thereof in which the victim was intentionally killed by the Defendant.
"It is further Ordered and Adjudged that the aggravating circumstances as set out hereinabove outweigh the mitigating circumstances which do not exist.
"The Court therefore sentences the Defendant, Charles Bracewell, to death, to be executed on Monday, the sixteenth day of May, 1978, by causing to pass through the body of the Defendant, Charles Bracewell, a current of electricity of sufficient intensity to cause death, and the application and continuance of such current through the body of the Defendant, Charles Bracewell, until he is dead.
"The conviction and sentence being subject to automatic review under Alabama law, the sentence is suspended pending appeal. No bail.
"Done and Ordered this the tenth day of April, 1978. Ab Powell, III, Circuit Judge."
The trial court's written findings of fact are a part of the record received here on appeal.
Appellant filed two motions requesting a change of venue which were denied. These motions were based on three newspaper articles concerning appellant and the charged crime, which were admitted into evidence during hearings on the motion. Appellant contends that the pretrial publicity removed the possibility of his having a fair and impartial trial in Covington County. Although sixteen members of the jury venire were familiar in varying degrees with pretrial publicity concerning the case, all in response to the trial court's questions responded either that they had no opinion about the case or that they would be satisfied being tried by a jury in their frame of mind, knowing what they knew of the case through pretrial publicity.
No error resulted from the trial court's failure to change the venue of the case. Although inflammatory pretrial publicity may be the ground for a change of venue, the burden is on appellant to demonstrate prejudice in the community which would preclude a fair and impartial trial. McLaren v. State, Ala.Cr.App., 353 So.2d 24, cert. denied Alabama, 353 So.2d 35. Newspaper articles, standing alone, will not support a motion for change of venue. McLaren, supra; Turk v. State, Ala.Cr. App., 348 So.2d 878.
Prior to trial, the court excused several jurors outside the presence of the appellant under authority of Act No. 200, Acts of 1971, which allows jurors to be excused outside the presence of the defendant in capital cases. Appellant contends that the law is unconstitutional in that it contravenes Code of Alabama 1975, Section 12-16-120 *838 under which appellant has a right to be present when jurors are excused. Article IV, Section 105 of the Constitution of Alabama prohibits local legislation on subjects provided for by general law. Here there was no error. Similar local laws in Mobile County and Jefferson County have been viewed as exempting appellant's right to be present during excusal of jurors. Thigpen v. State, 49 Ala.App. 233, 270 So.2d 666; Stewart v. State, 245 Ala. 511, 17 So.2d 871. The Jefferson County local law has been held constitutional. Dixon v. State, 27 Ala.App. 64, 167 So. 340, cert. denied, 232 Ala. 150, 167 So. 349.
During the qualification of the jury, the State challenged Mrs. Edna Gore for cause. The trial court overruled appellant's objection to the State's challenge which the trial court granted. The full voir dire examination of Mrs. Gore on the question of capital punishment is set out below.
"THE COURT: Do any of you have a fixed opinion against capital punishment? Capital punishment is punishment by death and in Alabama that means death by electrocution? Do any of you have a fixed opinion against capital punishment?
"JUROR: I do.
"THE COURT: And what is your name?
"JUROR: Edna P. Gore.
"THE COURT: Ms. Gore and you are from beat three in Opp, is that correct?
"JUROR: That's right.
"THE COURT: (Directed to counsel.) You wish to have the juror on voir dire?
"MR. COOK: Yes, Your Honor.
"THE COURT: All right. You may proceed.
"MR. COOK: May it please the Court, Mrs. Gore, you say that you have a fixed opinion against capital punishment and I apologize for singling you out in this case, but it is very important in this case and I am sure you realize that. Are you saying that you would never under any circumstances and in any case whatever return a death penalty?
"JUROR: I am afraid I wouldn't.
"MR. COOK: You would not no matter what the circumstances or what has been involved or are you just saying that you would rather not do that?
"JUROR: I had rather not. I mean, I wouldn't say that I wouldn't but I would rather not.
"MR. COOK: But you do say, if the case were bad enough you might return a verdict of death?
"JUROR: I just don't know how I would want to answer that, but I would hate to be responsible for that.
"MR. COOK: Yes, ma'am, but you understand this case involves that?
"JUROR: Yes, I do.
"MR. COOK: And you are saying that you could not and would not? Tell us now.
"JUROR: I don't believe I would. No."
Appellant insists that Mrs. Gore was not irrevocably committed in her opinion not to return a guilty verdict in which the penalty is capital punishment as required in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. However, an examination of Mrs. Gore's answers on voir dire reveals an emphatically held opinion against capital punishment and a commitment against returning a guilty verdict in a capital case. The trial court did not err in granting the State's challenge for cause.
At trial appellant objected to the admission in evidence of several photographs depicting the deceased lying in a pool of blood at the scene of the homicide. Appellant argues that since the location and character of the bullet wounds were not disputed and since there was no question as to the cause of death, the photographs' sole purpose was to unduly prejudice the jury.
The admission of these photographs into evidence did not constitute error. The fact that photographic evidence is merely cumulative of oral testimony does not affect its admissibility. Farris v. State, 57 Ala.App. 390, 328 So.2d 640. Nor is the fact that a photograph is gruesome a ground for excluding it from evidence where it sheds light on the ferocity of attack *839 and nature of wounds. Holloman v. State, Ala.Cr.App., 349 So.2d 131.
Appellant next urges that his confession, reduced to writing on January 23, 1978, was involuntarily given and should not have been admitted into evidence. Appellant states that this confession was made following incarceration for approximately eighty days; that appellant was repeatedly questioned from November 4, 1977, till January 23, 1978; that appellant was confined on numerous occasions in a black padded cell; and that appellant was shown photographs of the deceased's body depicting discrepancies in a previous statement. Appellant insists that all these surrounding circumstances when considered in their entirety establish that the confession should not have been admitted in evidence.
The record is replete with testimony from Sheriff Harrell and Sergeant Brewer that appellant was informed of his rights on each occasion when appellant offered a statement. Appellant consistently stated that he understood his rights and expressly waived them. Furthermore, the sole inference to be gained from the State's evidence is that no threats, promises or inducements caused appellant to confess that he committed the crime charged.
It is necessary to place each of the factors cited by appellant set out above in proper perspective. Of the eighty days incarceration appellant claims which passed before he signed the written confession on January 23, 1978, forty-five to sixty of them were spent in the Coffee County Jail on a distinct and separate charge. Appellant made an oral confession to Sheriff Harrell and Sergeant Brewer on November 4, 1977, only two days after he was arrested and confined in the Covington County Jail. The substance of this statement is unchanged by the statement given by appellant on January 23, 1978. Appellant's being placed in a padded cell resulted from destructive incidents committed by appellant during confinement in a regular cell in which he destroyed the commode and stopped up the lavatory causing the jail to be flooded. Furthermore, Sheriff Harrell's testimony, which stands uncontradicted, reveals that appellant changed his statement concerning the placement of the murder weapon before seeing photographs taken at the crime scene.
A finding of the trial judge as to the voluntariness of a confession, following a hearing held outside the presence of the jury, will not be disturbed unless contrary to the great weight of the evidence and manifestly wrong. Balentine v. State, Ala. Cr.App., 339 So.2d 1063. The rule is that, where evidence of circumstances surrounding a confession are conflicting on voir dire, the trial court must decide on its admissibility and then, if the confession is admitted, controverted testimony for the defendant goes to the jury on its credibility. Godfrey v. State, Ala.Cr.App., 333 So.2d 182; Taylor v. State, Ala.Cr.App., 337 So.2d 1368.
Where it was shown that appellant had been given Miranda warnings and a proper predicate was laid, showing that the confession was not induced by threats, promises, harm, or hope of favor, the trial court was correct in admitting appellant's confession into evidence.
During cross-examination by defense counsel of Sheriff W. E. Harrell concerning the voluntariness of statements made by appellant to him, the following occurred:
"Q. Then what you are telling the jury is that you didn't accept the confession and put it down in writing until you got it like you wanted it?
"A. No, sir. That is not true.
"Q. Until you got it like, her to say it too?
"A. No. No, sir, that is not true.
"Q. Then what are you telling us?
"A. I am telling you we talked to him time after time and he admitted from the very beginning that he shot and killed Rex Carnley. She denied it until February the nineteenth. And she told it like it was
"Q. Now, wait a minute. She told it what?
"A. She told it like he did, same thing. They both came in

*840 "Q. Told it like it was, is what you said, right, Sheriff?
"A. I'm sorry
"Q. Told it like you liked. That is what you said?
"A. No. I don't know how come me to say that.
"Q. Okay.
"A. You are wanting me to bring out the polygraph.
"Q. No. I didn't say anything about that?
"A. After she went and took the polygraph she come back
"MR. SIKES: Just a minute, now. We move for a mistrial on that.
"THE COURT: Yes. Let's be heard outside the presence of the jury. That is very significant. Members of the jury, just be at ease."
Following argument of counsel, the trial court overruled appellant's motion for a mistrial. However, the court did give the following prompt and vigorous instruction.
"THE COURT: Members of the jury, before we recessed and took a matter up outside of your presence there was a reference made to a polygraph test. I want to instruct you at this time that you are to absolutely disregard any references made to a polygraph whatsoever. You are not to consider it in any manner. It is not evidence. If you do consider it you will violate your oath as jurors. A polygraph test, whether one was performed in this case or any related case, is not admissible in evidence. And the reason is, it is not admissible in evidence is, because in the eyes of the law it is not the sufficient type of evidence to be presented to a jury. Therefore, if you consider it in any manner or any reference to a polygraph test in your considerations and in your deliberations of this case you will violate your oath as jurors.
"I deny the motion for a mistrial. You may proceed with your cross-examination."
Appellant contends now that the trial court committed reversible error in failing to grant a mistrial, citing Flurry v. State, 52 Ala.App. 64, 289 So.2d 632, cert. denied 291 Ala. 720, 289 So.2d 644; Johnson v. State, 46 Ala.App. 725, 248 So.2d 763; and Wilcutt v. State, 41 Ala.App. 25, 123 So.2d 193. While these cases are applicably cited for the principle that the taking of polygraph tests and their results are inadmissible in evidence, they are not dispositive of the present issue. Here the reference to a polygraph examination was oblique at best, the results of the examination being undisclosed. The trial court's lengthy admonitions to the jury to disregard Sheriff Harrell's unresponsive remark was more than ample to negate the possibility of error. Alabama Digest, Criminal Law, Section 1169.5(1).
Appellant further contends that the trial court erred in failing to grant a mistrial for a possible breach of the attorney-client privilege. Appellant's motion resulted from the testimony of Jerry Newton the chief jailer in the Covington County Jail. Newton testified that a one-way intercom system was used at the jail to monitor the prisoners. This system was on ninety percent of the time on a low volume. On cross-examination of Newton, the following occurred:
"Q. Let me ask you this, just for my own information. You mean that every time I have been down there to talk to him ya'll have been sitting up there listening to our conversation?
"A. No, sir.
"Q. Why not, if you had an intercom down there?
"A. Like I said, we have got the intercom down there, we don't have any communication. It stays on ninety percent (90%) of the time, but it is low. And I would say approximately every forty-five minutes to an hour we will turn it up and usually if they want something they will holler. And then we will cut it back down except at night. At night it is turned up to where the jailer on duty can hear in case one needs to go to a doctor or is sick.
"Q. Or if you want to listen in to hear what they say?

*841 "A. No. We have enough to do without having that problem too.
Appellant's contention that the attorney-client privilege was breached is without substantiation. Indeed, Newton, as seen above, emphatically denied having heard appellant converse with counsel.
Closely related to this contention is appellant's objection to Newton's testimony that he overheard, through the intercom, appellant shout at his wife "if she hadn't shot him, we wouldn't be in this mess that we are in now." Appellant argued at trial that he wasn't informed that his statements were being transmitted over an intercom system and that he had a right to have what he believed to be said in privacy kept private. The admission of this evidence was not error. For a full discussion of applicable principles see 57 A.L.R.3rd 172, admissibility, in Criminal Prosecution of Evidence Obtained by Electronic Surveillance of Prisoner.
During closing argument to the jury, the District Attorney explained the nature of circumstantial evidence by way of the following illustration:
".... You know, ladies and you gentlemen, your wives, when you go to bed at night and after supper at night, you clean up the kitchen a little bit and take a damp rag and wipe off the counter and the top of the stove and things you have in the kitchen. And you put everything up and clean up.
"I hope you ladies do that at night. And for you gentlemen, your wives do that, I presume they do. And everything is nice and clean when you go to bed. And you get up the next morning and go in the kitchen to make a pot of coffee and you see these little old, dark ... I don't really know ... rat pills on the stove and on the counter where some little, old mouse has been along and left a sign that he has been there.
"Now, you didn't see the rat when he got on your counter top and you cannot testify that you saw him, but in your mind he was there because what he left you have got to clean up the next morning. Now, that is circumstantial evidence. And it is strong.
The prosecutor further added:
"And speaking of rats, I can tell you there is one in this Courtroom that something has got to be done about."
Appellant objected to the comment and also moved for a mistrial. The trial court sustained the objection but denied the motion for mistrial. Appellant contends that it was error to refuse granting a mistrial in that no evidence produced in the trial furnished a foundation for the remark that appellant was a "rat."
The general rule is that improper argument of counsel is not ground for a new trial or the subject of review on appeal unless the complaining party has moved that the offending remark be excluded from the jury's consideration. The trial judge is under no duty to exclude improper argument ex mero motu. Cassady v. State, 51 Ala.App. 544, 287 So.2d 254 (wherein the defendant was called a "demon"); Liner v. State, Ala.Cr.App., 350 So.2d 760 (wherein defendant was called a "rattlesnake" and a "viper").
The only exception to the foregoing rule is when the argument is so greatly prejudicial that the effect is ineradicable, it may be made a ground for motion on new trial. Johnson v. State, 272 Ala. 633, 133 So.2d 53.
These rules prevail even under Section 12-22-241, Code of Alabama 1975, our "plain error" statute governing consideration of automatic appeals in capital cases. Embrey v. State, 283 Ala. 110, 214 So.2d 567; Johnson v. State, 272 Ala. 633, 133 So.2d 53; Jackson v. State, 260 Ala. 641, 71 So.2d 825; Washington v. State, 259 Ala. 104, 65 So.2d 704. Appellant's claim does not present an issue requiring reversal unless the District Attorney's comment is viewed as creating such a harmful effect as to be ineradicable by instructions to the jury.
We hold that the prosecutor's comment, though improper, is not of an ineradicable nature and does not warrant reversal *842 of this case. In Watson v. State, 266 Ala. 41, 93 So.2d 750, where the District Attorney referred to defendant as a "maniac", the following language is found.
"While we do not sanction name calling or odious comparisons, it is sufficient in most cases for the court to exclude the objectionable part of the statement. The following `inelegant and unparliamentary' statements in argument have been considered by our courts and held not to be grounds for reversal: `"This defendant has lied like a dog running on hot sand,"' Reed v. State, 32 Ala.App. 338, 27 So.2d 22, 24, certiorari denied 248 Ala. 196, 27 So.2d 25; defendant was `a smart aleck,' Ferguson v. State, 21 Ala.App. 519, 109 So. 764, certiorari denied 215 Ala. 106, 109 So. 764; `"defendant did not care any more for ruining that little girl than he did coming on the witness stand and swearing a lie, like he has done in this case,"' Baughn v. State, 22 Ala.App. 517, 117 So. 608; `"what monumental liars these plaintiffs are."' Green & Sons v. Lineville Drug Co., 167 Ala. 372, 52 So. 433, 436; `"From the evidence in this case he (the defendant) is a damned thief,"' Jackson v. State, 33 Ala.App. 42, 31 So.2d 514, 519, certiorari denied 249 Ala. 348, 31 So.2d 519."
Justice Merrill, writing for our Supreme Court, held that no reversible error resulted from the use of the offensive epithet. Further, the Supreme Court has declined to hold that referral to appellant as "Judas" results in reversible error. Poole v. State, 292 Ala. 590, 298 So.2d 89; Wright v. State, 279 Ala. 543, 188 So.2d 272.
Statements made by the prosecutor in argument to the jury must be viewed as in the heat of debate, and they are usually valued by the jury as their true worth and not expected to become factors in the bringing in of a verdict. Bullard v. State, 40 Ala.App. 641, 120 So.2d 580; Arant v. State, 232 Ala. 275, 167 So. 540. We cannot say that the argument of the prosecutor in the instant case was so prejudicial as to deprive appellant of a fair trial.
Appellant also contends that the District Attorney impermissibly commented on appellant's failure to testify in his own behalf. During closing argument the District Attorney referred to appellant's statement to Eddie Robertson, set out in the facts above. From the record:
"MR. McGILL: Another one is Eddie Robertson. And Mr. Sikes disagrees with Eddie Robertson. How we corraled him in there and beat him to come out here and tell you a point blank lie. I asked the man if he had helped raise this boy, sitting across this table right here, and he said he did, down there in the same community. And yet, did we corroborate this by what he said?
"Here comes Charles Bracewell to his home and stays there until he gets there that afternoon. And he tells him, I got to get out of Opp. I got to get out of the State. Rex Carnley over there that runs that filling station was killed. And the law is going to be looking for me.
"Now, did Sheriff Harrell and any of these monstrous deputies over there beat him in the head to get him to tell the man that raised him that? I don't think it was. I don't think anybody was over there except him and his wife and he and made that statement. Why would he make it? That hasn't been explained, why he made it, and it hasn't been contradicted.
* * * * * *
"MR. SIKES: I want to object to this about it not being contradicted and ask you to instruct them to disregard that. And I want to move for a mistrial on the grounds that he is referring to the fact that the Defendant did not take the stand and contradict it.
"THE COURT: Overrule your objection. Deny the motion for a mistrial."
After the District Attorney made these remarks appellant objected and moved for a mistrial. The trial court overruled the objection and denied the motion for a mistrial. Appellant argues in brief that "the only possible inference from this comment is that [he] himself should have taken the *843 stand and denied making the statement," citing Robinson v. State, Ala.Cr.App., 352 So.2d 11. That decision concerns comments during argument by the District Attorney which the defendant alone could have contradicted; thus, it is inapplicable in the case at bar. Here Robertson's wife was also present during the subject conversation and could have been utilized to contradict appellant's comments to her husband if necessary.
Next appellant contends that the court erred by failing to charge on lesser included offenses when the indictment alleged no capital offense. Code of Alabama 1975, Section 13-11-1 provides that in all cases where no aggravated circumstances, enumerated in 13-11-2, are expressly covered in the indictment, the trial shall proceed as now provided by law, except that the death penalty or life imprisonment without parole shall not be imposed, and the indictment shall include all lesser offenses. Appellant bases his argument on the fact that the indictment fails to expressly aver that the offense was committed "with aggravation."
Appellant's argument can only be labelled specious. The clear import of the term "with aggravation" as found in Alabama Code 1975, Section 13-11-2 is that the aggravation as enumerated in circumstances in that section must be sufficiently set out in the indictment.
In Evans and Ritter v. State, Ala., 361 So.2d 666, the Alabama Supreme Court held that an indictment, which alleged that the victim was intentionally killed while defendant was engaged in robbing him, sufficiently apprised defendant of the charge against him. To require that an indictment expressly aver the words "with aggravation" in such a case as the one at bar would, in the words of our Supreme Court in Evans and Ritter, supra, "constitute a rather narrow construction, neither called for, nor required, in our judgment ..."
Each of the seven counts in the instant indictment clearly apprises appellant that he has been charged with a capital offense. Thus the trial court did not err by failing to charge the jury in lesser included offense.
Appellant contends that the Alabama capital sentencing procedures are violative of the Eighth and Fourteenth Amendments to the Constitution of the United States because they fail to provide a reliable process for determining that death is the appropriate punishment in a particular case. Discussion of this question is pretermitted since our Supreme Court has affirmed the constitutionality of Act 213, 1975 Ala.Acts, page 701 et seq., now Sections 13-11-1, et seq., in Ex parte Jacobs, Ala., 361 So.2d 640.
Also appellant argues that Alabama capital sentencing procedures are faulty in that the trial judge is limited to consideration of mitigating circumstances enumerated by the statute, thus violating the Eighth and Fourteenth Amendments to the Constitution of the United States. Again, no discussion of this question is warranted. Our Supreme Court held in denying Jacobs' motion for rehearing that 13-11-1, et seq., supra, comport with the decision of the United States Supreme Court in Lockett v. Ohio, 438 U.S. 973, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).
The evidence presented by the State overwhelmingly establishes the guilt of appellant. Additionally, the evidence is sufficient to sustain the imposition of capital punishment. We note, however, that the trial court, enumerating the aggravating circumstances present in the case stated that the capital felony was committed for pecuniary gain. This circumstance could not properly be applied in a capital robbery case. Ex parte Cook, Ala., 369 So.2d 1251.
No error is reflected in the record and the judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except BOOKOUT, J., who dissents with an opinion.
BOOKOUT, Judge, dissenting:
I would remand to the trial court for further hearing to be conducted on the issue of the excusal of Edna Gore from the venire (as was directed by this court in Hill *844 v. State, Ala.Cr.App., 366 So.2d 296 [1978] cert. denied, Ala., 366 So.2d 318 [1979]).
In Witherspoon v. Illinois, 391 U.S. 510, at 522, n. 21, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1978), the United States Supreme Court stated:
"... The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the voir dire testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out...."
In 1976 that Court reaffirmed the Witherspoon test in Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339. Likewise, the Alabama Supreme Court in Liddell v. State, 287 Ala. 299, 251 So.2d 601 (1971), citing Witherspoon, restated the test to be applied in such cases by holding that a venireman may not be excused unless voir dire examination shows that he would "automatically vote against the imposition of the death penalty no matter what the evidence introduced at the trial might reveal."
The answers given by Edna Gore on voir dire examination indicate to me that she was not quite certain as to whether or not she would return a guilty verdict regardless of the evidence presented. When asked, "You would not no matter what the circumstances or what has been involved or are you just saying that you would rather not do that," she answered, "I had rather not. I mean, I wouldn't say that I wouldn't but I would rather not." When asked if she would return a death verdict if the case "were bad enough," she replied, "I just don't know how I would want to answer that, but I would hate to be responsible for that."
A similar response was given by a venireman in Witherspoon. Quoting from that opinion:
"Only one venireman who admitted to `a religious or conscientious scruple against the infliction of the death penalty in a proper case' was examined at any length. She was asked: `You don't believe in the death penalty?' She replied: `No. It's just I wouldn't want to be responsible.' The judge admonished her not to forget her `duty as a citizen' and again asked her whether she had `a religious or conscientious scruple' against capital punishment. This time, she replied in the negative. Moments later, however, she repeated that she would not `like to be responsible for * * * deciding somebody should be put to death.' Evidently satisfied that this elaboration of the prospective juror's views disqualified her under the Illinois statute, the judge told her to `step aside.'"
Because of the ruling by the trial judge, and other summary excusals, the Supreme Court found the trial court had committed error. It should be noted in Witherspoon and in the instant case both prospective jurors stated that they would not like "to be responsible" for imposing the death penalty.
In the instant case, while the potential juror answered two questions on voir dire which would indicate an unwillingness to return a verdict of death, still other answers, set out above, indicate that she was equivocating in her position on capital punishment. In the Hill case, we were faced with a similar situation and resolved it by remanding with directions for the trial to conduct a further voir dire examination on this issue with both the appellant and his attorneys present "with full right of cross-examination." We further ordered that a supplemental transcript of that hearing be prepared together with the trial court's findings which would be forwarded to this court. That procedure was adopted by our Supreme Court in Liddell, supra, and in Jackson v. State, 285 Ala. 564, 234 So.2d 579 (1970) and was again approved by that Court in denying certiorari in Hill, supra. I therefore would follow the same procedure in the instant case before making a final determination on the merits of the appeal.