298 So.2d 652

**Vincent THOMAS**

**v.**

**STATE.**

**6 Div. 555.**

Court of Criminal Appeals of Alabama.

Jan. 29, 1974.

Rehearing Denied March 19, 1974.

J. Massey Relfe, Jr., Birmingham, for appellant.

William J. Baxley, Atty. Gen., and Donald G. Valeska, II, Asst. Atty. Gen., for the State.

W. J. HARALSON, Supernumerary Circuit Judge.

The appellant was convicted of rape and sentenced to imprisonment for twenty years, from which judgment he has appealed.

At the conclusion of the testimony introduced by the State, the appellant moved to exclude the State's evidence on the ground that it failed to make a prima facie case of the charge against the appellant, and that there was a fatal variance in the proof and the pleading in the case. The court overruled the motion.

It is the contention of appellant that the State failed to prove any penetration, a constituent element of the offense of rape, therefore, the verdict of the jury should not be allowed to stand.

In order to determine whether the State has carried the burden cast upon it in this regard, it is necessary to examine the testimony offered by the State as reflected by the record.

In brief, the Attorney General agrees that the facts as set out in the "Statement of Facts" in appellant's brief are substantially correct. In addition thereto, the court will set out several excerpts from the record showing certain matters testified to by the State expert witness, Dr. James W. Mullis, Jr., the prosecutrix, and the state toxicologist directed to this question.

The evidence presented at the trial tends to show the following:

During the afternoon of June 11, 1972, the prosecutrix, who was at this time 13 years of age, was proceeding home from her aunt's house which was approximately six or seven blocks away. While walking by McAlpin Park, she met Vincent Thomas. The prosecutrix testified that the defendant asked her to cross a bridge, and she replied, "No." She testified further that he took her by the arm at this time "tight enough so I couldn't get aloose" and walked from the park up a deadend street to Western Olin High School. The appellant took her under a railroad track down to a creek bank where the alleged rape took place.

After the alleged rape took place, the defendant walked the prosecutrix to the corner of the block where her home was. Upon arriving at home where her mother, her aunt, her grandmother and a cousin were present, she informed them that Vincent Thomas had "got after her."

The police were called to investigate and later in the evening, the prosecutrix was taken to the University Hospital in Birmingham for examination as a result of the alleged rape.

The prosecutrix testified on at least three occasions to the effect that "he tried to get in there and that's all." She did not know if he put his private parts into hers.

There was testimony from Leona Williams, mother of the prosecutrix, and Felicia Hollis, a cousin of the witness, as to the condition and physical appearance of the prosecutrix on her arrival at her home after the alleged incident happened.

Dr. James Mullis, Jr., an expert witness who examined the prosecutrix in conjunction with this incident, testified as to what his examination revealed as far as the condition of the pelvic area of the prosecutrix. Sgt. Webb of the Birmingham Police Department testified that he investigated the alleged rape on June 11, 1972. Sgt. Webb removed several items of clothing from the prosecutrix's home which were introduced into evidence along with a picture which Sgt. Webb took of the prosecutrix shortly after this alleged incident occurred.

The State Toxicologist, Mr. Robert B. Johnson, further testified as to his findings regarding the evidence presented to him by Sgt. Webb.

In addition to the above statement of facts from appellant's brief, the following testimony was introduced by the State:

The prosecutrix testified that:

"Q. And what did he do when he laid you down?

"A. He unzipped his pants and then he pulled down mine.

"Q. Did you ever try to get up?

"A. No.

"Q. Did you ever scream?

"A. Yes, sir.

"Q. What did he do?

"A. He took my pants off and put them in my mouth. Then I took them out and then he got me by my neck and almost choked me to death.

"THE COURT: Wait a minute.

"MR. ROBISON: Your Honor, we would object—I think. Well, I withdraw the objection.

"THE COURT: Go ahead.

"Q. What did he do first? Take your pants off or unzip his pants first?

"A. He unzipped his.

"Q. How were you dressed that day?

"A. Had on an aqua blue dress, an aqua blue dress.

"Q. What kind of dress was it?

"A. It was a straight dress with a belt and two pockets.

"Q. Was it day or night at that time?

"A. Day.

"Q. And did you see his private parts?

"A. Yes, sir.

"Q. What else happened?

"A. He tried to get it in there and that's all. Then he let me go, let my neck go.

"Q. Let you go?

"A. See. he had his hand around me.

"Q. Was he choking you?

"A. Yes, sir. So then—"

The gynecologist, Dr. J. W. Mullis, Jr., testified to the following:

"Q. What did your examination reveal as far as the condition of the vaginal area?

"A. As noted, examination of the Labia Minora with surrounding tissues around it and the vagina revealed several abrasions. The hymenal ring revealed only remnants of the hymenal ring present; no bleeding was present but again areas were noted of abrasion.

Examination of the vagina and cervix revealed a thick discharge. There was no evidence of trauma to the vagina or cervix.

The perineum, which is the area just surrounding the entrance to the vagina, did not show any—this is just below the area of the vagina on the outside—showed no evidence of trauma.

"Q. What was it you called the vaginal fold?

"A. The tissue surrounding the entrance to the vagina is the Labia Minora.

"Q. And you say there were abrasions at that point?

"A. Right.

"Q. And there were abrasions on the hymenal 'wall'? (sic)

"A. Well, the hymenal ring had remnants of the hymenal membrane or structure just covering the entrance of the vagina, evidence of abrasions. There was just a little tag of hymen in the entrance.

"Q. Without appearing ridiculous, the hymenal ring is located further in-

side the vaginal opening than the Labia Minora?

"A. Right, this is correct.

"Q. Were you able to conduct an examination to determine whether any sperm or semen were present in the vagina?

"A. Right. I collected a specimen from the vaginal canal and examination at this time by myself revealed sperm in the specimen and I did call the lab and they followed up on the result which was confirmed by a pathologist at University, also reconfirming my finding of sperm. If you will allow me to read—

"MR. ROBISON: We object to the pathologist's report. We want to know only what he knows.

"THE COURT: Sustained. It would call for hearsay.

"A. My findings were sperm in the vaginal secretion."

"REDIRECT EXAMINATION

"Q. (By Mr. Pickard) One final question. The abrasions you found were the result?

"A. The abrasions were a result.

"Q. Those abrasions were on the exterior, is that correct?

"A. Correct.

"Q. But you did find abrasions on the hymenal ring, or remnants?

"A. He asked if I found abrasions on the exterior, is that correct? They were on the hymenal ring. In attempting to say there were abrasions on the hymenal ring, which is getting to a very shady point as far as that is the entrance if that is saying once you get inside the ring one is inside the vagina and one is outside, but that is correct. She did have abrasions on the ring itself."

The State toxicologist testified to the following concerning the underclothing that the prosecutrix was wearing on the day of the alleged rape:

"Q. And in regards to the panties, you removed part of the material of the panties and I assume you made an examination of the material from the panties?

"A. Yes, sir, we did.

"Q. What kind of examination?

"A. We made a microscopic examination calculated to examine for blood and semen.

"Q. Have you done any of these examinations and tests before in the past?

"A. Yes, sir, I have.

"Q. What did your examination reveal?

"A. We found both blood and semen present.

"Q. And that was in the panties?

"A. That's correct, sir, in the crotch of the panties.

"Q. In the crotch area of the panties?

"A. Yes, sir.

"Q. When you made the examination, was the semen in a dried or liquid state?

"A. It was dried."

■ Rape is unlawful carnal knowledge of a woman by a man forcibly and against her will. Stewart v. State, 27 Ala.App. 315, 172 So. 675, cert. denied 233 Ala. 480, 172 So. 678; Harris v. State, 2 Ala.App. 116, 56 So. 55.

To adopt a statement from appellant's brief which accurately reflects the law in Alabama:

"Penetration alone, the other elements of the crime concurring, is rape, without re-

**236**

gard to the actual completion of the act, and without regard to the condition of the mind of the prosecutrix or of the defendant subsequent to the actual penetration; *but there must be actual penetration.*" Herndon v. State, 2 Ala.App. 118, 56 So. 85; Waller v. State, 40 Ala. 325; Harris v. State, supra; Ballew v. State, 23 Ala.App. 274, 124 So. 123.

 Penetration and sexual intercourse are synonymous terms. Ballew v. State, supra. Carnal knowledge is synonymous with sexual intercourse in its legal sense. Reynolds v. State, 274 Ala. 171, 146 So.2d 85.

From American Jurisprudence 2d, Vol. 65, Rape, § 3, we quote:

"The actual penetration of the female sex organ by the male sex organ is required as an element of rape, according to all the authorities and this penetration constitutes carnal knowledge, which is synonymous with sexual intercourse." Reynolds v. State, supra.

In Corpus Juris Secundum, Vol. 75, Rape, § 10b we find the following:

"However, penetration to any particular extent is not required, * * * nor need there be an entering of the vagina or rupturing of the hymen, the entering of the vulva or labia being sufficient; but some degree of entrance of the male organ within the labia pudendum is essential."

From a careful consideration of all the testimony shedding any light on this question, we conclude in fact that there was penetration to some extent proved by the State, and that the other essential elements of rape are present in the State's testimony. There was no error in overruling the motion to exclude.

The appellant denied any guilt, testifying that, although he had seen the girl momentarily in a grocery store earlier in the afternoon, he left and saw the girl no more. He claimed to be at another place after he left the store until late that night.

A jury question was presented by the evidence and properly submitted to the jury by the court.

Although what we have said above disposes of the main argument of appellant, we have searched the record for any error that might appear therein and finding none, this cause is due to be affirmed.

The foregoing opinion was prepared by Honorable W. J. HARALSON, Supernumerary Circuit Judge, serving as a Judge of this Court under § 2 of Act No. 288, Acts of Alabama, July 7, 1945, as amended; his opinion is hereby adopted as that of the court.

The judgment below is hereby

Affirmed.

All Judges concur.