555 So.2d 196 (1988)
Darryl Eugene FREEMAN
v.
STATE.
8 Div. 200.
Court of Criminal Appeals of Alabama.
March 22, 1988.
Rehearing Denied September 20, 1988.
*199 James M. Dyer and R. Wayne Wolfe, Huntsville, for appellant.
Charles A. Graddick and Don Siegelman, Attys. Gen., and P. David Bjurberg, William D. Little and William W. Whatley, Asst. Attys. Gen., for appellee.

ON APPLICATION FOR REHEARING
McMILLAN, Judge.
This Court's original opinion of June 10, 1986, is hereby withdrawn and the following opinion is substituted therefor:
The appellant was indicted for the capital offense of murder committed during a rape in the first degree or attempt thereof, § 13A-5-40(a)(3), Code of Alabama (1975). The appellant pleaded not guilty and not guilty by reason of insanity, but withdrew the insanity plea prior to trial. The jury returned a verdict of guilty of the capital offense and, following a sentencing hearing held pursuant to § 13A-5-45, Code of Alabama (1975), unanimously recommended a sentence of life without parole. The trial court held a hearing pursuant to § 13A-5-47, Code of Alabama (1975), and sentenced the appellant to death.
*200 April Denna Scott, two and a half years of age, was pronounced dead on arrival at Huntsville Hospital around 5:30 a.m., on October 9, 1983. The coroner testified that the victim had suffered a large hematoma over the mid-forehead, multiple contusions about the cheeks, multiple contusions and lacerations of the tongue, a large hemorrhage underneath the scalp, a bilateral hemorrhage under the covering of the brain, massive swelling of the brain, lacerations or tearing of the frontal lobe, and a bruise on the back part of the brain. He further noted multiple bruising of the upper torso, bleeding underneath the skin, a bruise in the right lung, a bruise in the thymus gland, a bruise involving the diaphragm, a crushing of the leader to the liver, hemorrhage around the adrenal gland and the pancreas, and a bruise in the spleen. He testified that there were injuries to the child's genitalia, including a laceration of the hymen, as well as a superficial bruising of the outer aspect of the hymen. He classified the injuries to the genitalia as massive and stated that the cause of death was blunt force trauma. A forensic scientist testified that he found seminal fluid stains on two swabs submitted by the coroner following his examination of the victim's genitalia.
The appellant gave an oral statement to the police at the hospital in which he claimed that the child woke up, vomited, but then appeared to go back to sleep. He denied having any knowledge of how the child died. He subsequently gave an oral statement and a written statement at the police station admitting that he killed the child. He stated that he had been living with the child's mother, Angela Scott, for six or seven months; that Angela Scott left with her sister around 11 o'clock on Saturday, October 8, to go out on the town, while he remained to keep the baby; that he pulled a mattress into the living room and began watching television, while the child slept on the couch; that after he had fallen asleep, the child awoke and began crying; and that he told her to be quiet, but she continued to cry and arose from the couch; and that he told her again to be quiet, but she continued to cry; so he hit her in the stomach with his fist. He stated that she did not fall down, but continued to cry; that he hit her again in the stomach with his fist, knocking her to the floor; that she stood up, still crying, and he hit her again in the stomach, knocking her down; that she rose again crying and he hit her in the head with his fist, knocking her down; that when she stood again, he hit her a second time in the head and, as she fell, she hit her head on the coffee table. He stated that she was no longer moving so he picked her up and noted that she appeared limber, that her head was dangling and that her eyes were rolling around in her head. He said that he laid her back on the couch and that, five to ten minutes later, she began vomiting; that he cleaned up the couch and floor with paper towels, which he deposited outside in a garbage can; that the child again got sick, vomiting blood, which he cleaned up with paper towels; and that he could hear April moaning and then thought she went to sleep. He also said that around 4:30 a.m. on October 9, Angela Scott returned and he told her that the child had gotten sick, and that she determined that the baby was not breathing and ran to call an ambulance and her mother. The appellant stated that he had "just gotten mad" and "felt like the devil was inside of him." He stated that he did not intend for April to die.
At trial, the appellant testified to substantially the same facts, claiming that he did not intend to kill the child. He never admitted having any type of sexual contact with the victim.

I
The appellant argues that the evidence was insufficient to support the element of sexual intercourse or attempt thereof included in the capital offense. The coroner testified that the victim suffered massive injuries to her genitalia, including laceration of the hymen and outer hymen areas. He further testified, however, on cross-examination that in his opinion the injuries were not sustained as the result of intercourse. He stated on direct examination that the injuries might be consistent with *201 someone's having attempted to have intercourse with her. There was further evidence that seminal fluid, which is only produced by a male, was found in her vaginal canal, although no spermatozoa were observed. The appellant produced evidence that he does not suffer from any condition which would have caused the lack of spermatozoa in his seminal fluid. The appellant admitted to being alone with the child on the night in question, and there is no evidence that any other male came into contact with the victim, nor was there any other explanation given for the injuries to her genitalia.
"In determining the sufficiency of the evidence to sustain the conviction, this court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution. Johnson v. State, 378 So.2d 1164, 1169 (Ala.Cr.App.), cert. quashed, Ex parte Johnson, 378 So.2d 1173 (Ala.1979)." Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Faircloth, 471 So.2d 493 (Ala. 1985). The crime of rape requires proof of an actual penetration of the female sex organ by the male sex organ. Rowe v. State, 421 So.2d 1352, 1356 (Ala.Cr.App. 1982). See also Jackson v. State, 471 So.2d 516 (Ala.Cr.App.1985). "`However, penetration to any particular extent is not required,... nor need there be an entering of the vagina or rupturing of the hymen, the entering of the vulva or labia being sufficient; but some degree of entrance of the male organ within the labia pudendum is essential.'" Thomas v. State, 53 Ala. App. 232, 298 So.2d 652, 656 (Ala.Cr.App.), writ. denied, 292 Ala. 755, 298 So.2d 657 (1974). Whether such penetration is accomplished is a factual question for the jury. Jackson v. State, 390 So.2d 671, 673 (Ala.Cr.App.1980), writ denied, 390 So.2d 675 (Ala.1980). A review of the facts clearly indicates that the jury could reasonably have inferred that there had been a penile penetration. Jackson v. State, supra; Hepstall v. State, 418 So.2d 223 (Ala.Cr. App.1982). This is true despite the appellant's persistent denial of the rape or attempted rape. Johnson v. State, 473 So.2d 652, 657 (Ala.Cr.App.1985).
Furthermore, the evidence would be sufficient to support a conviction of the capital offense where the State proved attempted rape in the first degree. "A person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he does any overt act towards the commission of such offense." § 13A-4-2(a), Code of Alabama (1975). The coroner testified that, although he did not believe the victim's injuries were caused by intercourse, he testified that penetration had occurred and that the injuries were consistent with attempted intercourse. The State presented ample circumstantial evidence of an attempt to commit rape in the first degree. See Utley v. State, 508 So.2d 287 (Ala.Cr.App.1986). Whether circumstantial evidence which tends to connect the appellant to the crime excludes to a moral certainty every other reasonable hypothesis but that of guilt, is a question for the jury and not this court. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). "[T]here was evidence from which the jury might reasonably conclude that the evidence and all reasonable inferences therefrom excluded every reasonable hypothesis other than guilt and proof of the corpus delicti of rape." Dunkins v. State, 437 So.2d 1349, 1354 (Ala.Cr.App.1983) affirmed, Ex parte Dunkins, 437 So.2d 1356 (Ala.1983) (emphasis in original).

II
The appellant argues that his statements were not voluntary, but were made because of a promise of leniency offered by the police officers in return for the statements. The appellant does not deny that he was properly advised of his Miranda rights, but contends that he was told by Officer Danny Cox that if he would confess to killing the deceased, he would not receive the death penalty and, further, that he was told by Officer Howard Turner that if he would cooperate he might receive better treatment by the court.
*202 The record indicates that the first statement was made by the appellant in a small office at the hospital after the victim had been pronounced dead on arrival. Officer Cox testified that he and another officer were present and that the appellant responded that he understood his rights and would talk to the police officers. Officer Cox testified that the appellant indicated that he understood he was neither being threatened, nor being promised anything in return for a statement. He testified that no one promised the appellant anything or threatened, touched, or cajoled him in Officer Cox's presence. The appellant then gave a statement denying any knowledge of the reason for the victim's death.
The appellant next made a statement on October 12 at the Huntsville Police Department. Officer Cox and Officer Turner were present during the interview. Officer Cox testified that the appellant stated that he would be glad to talk to the police and that the victim's mother had asked him to do so. The appellant was not taken into custody. Officer Cox and Officer Turner picked up the appellant at 3:35 p.m. and the interview began at 4:30. The appellant was read his Miranda rights and he indicated that he understood them. Officer Cox and Officer Turner testified that no one promised the appellant anything nor threatened him in any manner. Officer Cox testified that he did not tell the appellant "it would be better for him if he would confess." The appellant initially repeated his original statement, after which Officer Cox told the appellant that the Angela Scott had taken and passed a polygraph test and that the appellant was the officers' only suspect in the case. Cox further informed the appellant that they had gotten a report back from the State Crime Lab indicating that the victim's death was the result of blunt trauma to the body and head, crushed liver, and brain tissue damage, and that he knew the victim had been beaten to death. He stated that the appellant had already told him that he was the only one keeping the victim and that none of his friends were present. Officer Cox then left the office for five minutes. Officer Turner testified that while Officer Cox was out of the office, he told the appellant that, in his opinion, he believed the appellant had tried to rape the victim and that when she awoke, he beat her to death. Officer Turner then testified that the appellant began crying and stated, "That's not how it happened." Officer Turner asked Officer Cox to return to the office, where the appellant, who was still crying, stated that he had killed the victim, but had not meant to. Officer Cox testified that the appellant would not stop crying so they took a break. The officers went downstairs and told the appellant's family that the officers were still in the process of interviewing the appellant and that the family would be able to see him as soon as the interview was finished. Officers Cox and Turner further testified that the appellant never asked for an attorney or for his family; however, they said, he once asked to tell the victim's mother that he was sorry. After the appellant admitted to killing the victim, he was allowed to visit with his family for 20 or 25 minutes. Thereafter, Officer Cox asked the appellant if he would make a written statement, and the appellant agreed to do so. He began this statement at 7:25 p.m. and completed it at 9:04. At 10:10 the appellant was taken upstairs and placed in the city jail on a charge of murder.
Officer Cox testified that on October 20 he received the forensic science reports concerning the seminal fluid and that he interviewed the appellant in a small office at the jail on that date. Officer Turner was also present. Officer Cox testified that the appellant was read his rights, that he stated that he understood them, and that he did not ask for an attorney. Officer Cox testified that the appellant was neither promised anything nor threatened in any way. He further testified that he did not tell the appellant that it would be better for him to confess. Officer Cox testified that he asked the appellant if he had had any type of sexual activity with the victim before he killed her. Cox said that the appellant denied any such activity and stated, "I've already told you that I beat and killed April, but I did not rape *203 her." The appellant admitted at trial to making that statement. Officer Cox then asked the appellant if he was in his "right mind" when he killed the victim, and that the appellant responded, "Man, there ain't nothing wrong with me. She just made me mad."
Where there is conflicting testimony concerning the voluntariness of a confession, the trial court's determination will not be disturbed unless it appears to be contrary to the great weight of the evidence. Harris v. State, 280 Ala. 468, 195 So.2d 521 (1967). See also Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).
"`The findings of a trial court on a motion to suppress are binding on this Court unless they are clearly erroneous. United States v. Gunn, 428 F.2d 1057, 1060 (5th Cir.1970). The trial judge's determination of the voluntariness of a confession "is entitled to great weight on appeal and will not be disturbed unless it appears to be contrary to the great weight of evidence and manifestly wrong." Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). "When confessions are admitted on controverted questions of fact, this Court will not revise the rulings of the lower court, admitting them, unless they appear to be manifestly wrong." Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542 (1947); Thompson v. State, 347 So.2d 1371, 1375 (Ala.Cr.App.), cert. denied, Ex parte Thompson, 347 So.2d 1377 (Ala.1977), cert. denied, 434 U.S. 1018, 98 S.Ct. 740, 54 L.Ed.2d 765 (1978). "We know of no principle which will authorize us, in this case, to depart from the rule laid down above." Bonner v. State, 55 Ala. 242, 247 (1876).'"
Hooks v. State, 534 So.2d 329 (Ala.Cr.App. 1987), quoting Simmons v. State, 428 So.2d 218, 219 (Ala.Cr.App.1983).
Officer Thompson's statement of his theory of the case to the appellant in Officer Cox's absence, was not improper. "Confessions are not rendered inadmissible by reason of having been obtained by propounding to the accused questions assuming his guilt. Curry v. State, 203 Ala. 239, 82 So. 489 (1919); White v. State, 133 Ala. 122, 32 So. 139 (1902)." Twymon v. State, 358 So.2d 1072, 1074 (Ala.Cr.App.1978). See also Golden v. State, 439 So.2d 813 (Ala.Cr. App.1983) (it is permissible for an officer to tell an appellant during questioning that he has lied). It was also not improper for Officer Cox to inform the appellant of the lab results or the results of Angela Scott's polygraph test. Cf. Gibson v. State, 347 So.2d 576, 582 (Ala.Cr.App.1977) ("mere confrontation with a co-defendant's confession cannot be held to be an unfair tactic or unlawfully coercive," citing Vander Wielen v. State, 47 Ala.App. 108, 251 So.2d 240, cert. denied, 287 Ala. 742, 251 So.2d 246 (1971); Williams v. State, 461 So.2d 834, 841 (Ala.Cr.App.1983), reversed on other grounds, Ex parte Williams, 461 So.2d 852 (Ala.1984) ("disclosure of incriminating evidence to the accused, United States ex rel. Gorham v. Franzen, 675 F.2d 932, 938 (7th Cir.1982); Moore v. State, 415 So.2d 1210, 1214 (Ala.Cr.App.1982), does not necessarily render a subsequent confession involuntary"). Nor was Officer Cox's exhortation to the appellant prior to his admission improper. Officer Cox testified that he said, "Darryl, you are our only suspect and we have a lot of reasons to believe that you killed that child. We want to know about it." "A promise or inducement for a confession cannot be implied from an exhortation to a prisoner that it is best or better to tell the truth." Eakes v. State, 387 So.2d 855, 859 (Ala.Cr.App.1978). In Williams v. State, supra at 842, testimony was produced that the appellant was "led to believe that it was in his best interest to go ahead and get the facts." However, this court held that under the circumstances the statement was not involuntary and that the true test of determining whether confessions are voluntary is "whether the defendant's will was overborne at the time he confessed and therefore not the product of a rational intellect and a free will." Id. See also Bennett v. State, 409 So.2d 936, 939-40 (Ala.Cr.App.1981), cert. denied, 457 U.S. 1137, 102 S.Ct. 2968, 73 L.Ed.2d 1356 (1982) (wherein the appellant was told that "the best thing to do if he was involved *204 was to tell the truth," but his confession was found to be voluntary).
Although the appellant contends that before he made his written statement, Officer Cox told him that he should confess if he killed the victim because, if he did so, he would not "get the electric chair," Officer Cox denied making such a promise.[1] Conflicting evidence as to voluntariness is a matter for the trial judge's determination, and we do not find his decision to be manifestly wrong or contrary to the great weight of the evidence. Harris v. State, supra. "[W]here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact." Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960). Given the totality of the circumstances, we accept the finding that the appellant's statements were voluntary. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1342-43, 10 L.Ed.2d 513 (1963).

III
The appellant alleges that § 12-16-152, Code of Alabama (1975), denied him due process and equal protection in regard to challenging veniremen for cause under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Section 12-16-152, Code of Alabama (1975), reads as follows:
"On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the State that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence."
The appellant contends that this statute would allow the exclusion of veniremen who do not meet the test of Witherspoon v. Illinois, supra. The Court in Witherspoon held that a state may properly execute a defendant sentenced to death by a jury from which the only veniremen excluded for cause made it "unmistakably clear"
"(1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt."
Witherspoon v. Illinois, 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21 (Emphasis in original.) See also Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). Thus, Witherspoon and § 12-16-152 provide for the exclusion of veniremen who would refuse to impose the death penalty regardless of the evidence.
The appellant further argues that the exclusion of veniremen on Witherspoon grounds denied him the right to a trial by an impartial jury. However, this claim has been laid to rest by the United States Supreme Court in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), and by the Alabama Supreme Court in Ex parte Wright, 494 So.2d 745, 749 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987). See also Ex parte Neelley, 494 So.2d 697, 704-05 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987); Johnson v. State, 502 So.2d 877, 879 (Ala.Cr.App. 1987).
The standard for determining if a juror is disqualified from serving in a death penalty case is whether his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). It need not be shown with "unmistakable clarity" that the person would automatically vote against the death penalty. Id.
The appellant also argues that the exclusion of such veniremen produces juries that are conviction-prone and prone to impose *205 the death penalty. This court has previously rejected the contention that death qualified juries are conviction-prone. Clark v. State, 451 So.2d 368, 370 (Ala.Cr.App.1984), citing McGinnis v. State, 382 So.2d 605 (Ala.Cr.App.1979), cert. denied, 382 So.2d 609 (Ala.1980). As in McGinnis, the record is "totally lacking" as to any factual information that would assist the court in determining whether jurors who are not opposed to the death penalty tend to favor the prosecution in the determination of guilt.[2] "This court can only consider a case as presented by the record, Jackson v. State, 260 Ala. 641, 71 So.2d 825 (1954), and will not presume a fact not shown by the record and make it a ground for reversal. Duncan v. State, 88 Ala. 31, 7 So. 104 (1889)." McGinnis, supra, at 607-08. Moreover, in Morrison v. State, 500 So.2d 36, 40-42 (Ala.Cr.App.1985) aff'd, 500 So.2d 57 (Ala. 1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987), the appellant contended that the death qualification of the trial jury denied him his rights to reliability in the capital sentencing process. This court rejected the argument citing Smith v. Balkcom, 660 F.2d 573 (5th Cir. 1981), cert. denied, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982), and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). We further note that in the case at hand the jury returned an advisory verdict of life without parole.
Last, because the jury's sentence verdict is only a recommendation, the appellant argues that the State should no longer be allowed to exclude veniremen who are irrevocably opposed to the imposition of the death penalty. "Under Witherspoon a defendant in a capital case has no right to jurors, even if they only recommend sentence, whose sentencing decision is unalterably pre-determined in the defendant's favor." In re Shriner, 735 F.2d 1236, 1241 (11th Cir.1984). (Emphasis added.)

IV
The appellant alleges that a comment made by the prosecutor concerning his failure to take a polygraph test violated his right against self-incrimination. The following transpired during the prosecutor's closing argument:
"[Prosecutor]: ... The mother of the child, Angela Scott, was at the time that they picked Darryl Freeman up at the Police Department undergoing a polygraph examination, something that Darryl Freeman refused to submit to.
"[Defense Counsel]: Your Honor, we would object as to what Darryl Freeman had refused to do.
"THE COURT: I sustain the objection. Ladies and gentlemen, disregard the fact that he refused to take a polygraph test. It is not required in this state, and the results are not admissible if it had been taken."
"We recognize the general rule in Alabama to be that the results of polygraph or lie detector tests are not admissible. Flurry v. State, 52 Ala.App. 64, 289 So.2d 632 [Ala.Crim.App.1973]; Wilcutt v. State, 41 Ala.App. 25, 123 So.2d 193 [1960]." Stewart v. State, 398 So.2d 369, 374 (Ala.Cr. App.1981), writ. denied, 398 So.2d 376 (Ala. 1981). However, the trial court's prompt and vigorous instructions to the jury negated the possibility of prejudice by the reference to the polygraph examination. Bracewell v. State, 407 So.2d 827, 840 (Ala.Cr. App.1979). "`[T]he general rule is that prejudicial statements, even though improper, are considered capable of being eradicated by the trial judge in sustaining objections thereto or by appropriate instructions to the jury or both. Allred v. State, [291 Ala. 34, 277 So.2d 339 (1973) ]; Dunn v. State, 277 Ala. 39 at 44, 166 So.2d 878 (1964); Bachelor v. State, 216 Ala. 356, 361, 113 So. 67 (1927); Anderson v. State, 209 Ala. 36, 44, 95 So. 171 (1922).' (Emphasis added.)" Sales v. State, 435 So.2d 242, 245 (Ala.Cr.App.1983).
Furthermore, the following occurred during the direct examination of the appellant:
"[Defense Counsel]: What happened after that?
*206 "A: Well, after that he was talking to Angela and then he asked me would I take a lie detector test.
"Q: What did you tell him?
"A: I told him, `no.'
"Q: Why did you tell him that you would not take a lie detector test, Darryl?
"A: Because I was scared."
Thus, the prosecutor's statement concerning the polygraph examination was proper under the curative admissibility doctrine. "Under this doctrine, if a party introduces illegal evidence, his opponent has the right to rebut such evidence with other illegal evidence. C. Gamble, McElroy's Alabama Evidence, § 14.01 (3rd ed. 1977); Sanders v. State, 48 Ala.App. 589, 266 So.2d 797 (1972)." Spellman v. State, 500 So.2d 110 (Ala.Cr.App.1986) (wherein the appellant was not allowed to invoke this doctrine because he did not originally state whether he would submit to the polygraph examination, but merely that he would like to ask his attorney's advice).

V
The appellant argues that the trial court erred in allowing into evidence clothing of the victim and vaginal swabs because, he says, the State failed to show a proper chain of custody.
The record indicates that the victim's body arrived at the Huntsville Hospital at approximately 5:00 a.m. Nurse Hamilton came on duty at 7 o'clock a.m. and noted that the victim's pajama bottoms and panties had already been removed and placed in a hospital bag, the "critical care sheet" stating that Holly Bailey had removed the clothing. She further testified that no one in her presence removed the clothing from the bag. Nurse Hamilton took a sample with a vaginal swab, placed it in a vacutainer and taped it to the victim's chest. She then delivered the victim's body to the morgue and the bag containing the clothes to Investigator Ron Adams. Investigator Adams testified that he received the pajama top and bottom and the panties from Nurse Hamilton and stored them in his locker. The following day, he transported the evidence to the Department of Forensic Sciences.
Nurse Douglas testified that when she came on duty at the Huntsville Hospital at 2:45 p.m., the victim's body was in the morgue cooler. She surrendered the body at 3:10 p.m. to a contract driver, who testified that he drove it to the morgue at the Department of Forensic Sciences and placed it in the cooler. The coroner performed a post-mortem examination on the body on October 10. He testified that a test tube containing the swab was taped to the body. He took two vaginal swabs in the course of his examinations and submitted them to a forensic serologist. The serologist testified that he received the clothing from Investigator Adams on October 11 and the swabs on October 12.
The appellant argues, because there was no testimony as to how the pajama bottoms and panties were removed and by whom, that the State failed to adequately establish a chain of custody. Further, he argues, because there was no testimony concerning how the vaginal swabs taken by the coroner, Dr. Agular, were stored prior to being transported to the forensic serologist, that they were improperly admitted. As to the swab which Nurse Hamilton took and attached to the victim's body, he argues that the State failed to show what happened between the time the body was delivered to the morgue by Nurse Hamilton at 7:40 a.m. and the time Nurse Douglas came on duty at 2:45 p.m.
The appellant's arguments concern weak links, rather than missing links, in the chain of custody and therefore affect the weight to be given the evidence rather than its admissibility. The appellant cites Nolen v. State, 469 So.2d 1326 (Ala.Cr.App.1985), to support his argument; however, in Nolen there was an "obvious break" in the chain of custody. Furthermore, in Nolen, the trial judge sustained the appellant's objection to the admission of the evidence where the witness testified that the X-rays which he used to identify the victim were given to him by "someone" from the Birmingham Police Department who alleged that they depicted the victim's teeth.
*207 In the case sub judice, there is no such gap in the chain of custody. "To establish a sufficient predicate for admission into evidence it must be shown that there was no break in the chain of custody of the [item]. Identification and continuity of possession must be sufficiently established to afford ample assurance of the authenticity of the item." Ex parte Yarber, 375 So.2d 1231, 1234 (Ala.1979). "The purpose in establishing a chain of custody is to show reasonable probability that the [evidence] was not tampered with." Bell v. State, 339 So.2d 96, 98 (Ala.Cr.App.1976). "In passing upon the admissibility of such evidence, `the trial judge should consider the nature of the article and the circumstances surrounding its preservation and custody,' and permit its introduction where continuity of possession is `sufficiently established to afford ample assurances of ... authenticity.' Washington v. State, 339 So.2d 611, 615 (Ala.Crim.App.), cert. denied, 339 So.2d 616 (Ala.1976) (citations omitted)." Oliver v. State, 479 So.2d 1385, 1390 (Ala.Cr.App.1985). The procedure used to guard against tampering in the present case was sufficient. A review of the record gives us no reason to suspect tampering or substituting. There was no break in the chain of custody which would warrant exclusion of the evidence. See Blackmon v. State, 487 So.2d 1022, 1024-25 (Ala.Cr.App.1986). The evidence provided a "`reasonable certainty that there had been no substitution, alteration, or tampering with'" the evidence. McIntosh v. State, 443 So.2d 1275, 1280 (Ala.Cr.App.) reversed on other grounds, 443 So.2d 1283 (Ala.1983), quoting Oliver v. State, 399 So.2d 941 (Ala.Cr.App.1981).

VI
The appellant contends that the trial judge erred in failing to read requested jury charges which were marked as "given." The appellant specifically notes the trial court's failure to give his requested charge on the effect of circumstantial evidence in a capital case. A review of the record convinces us that, although the requested charges about which the appellant complains were marked as "given" and not read verbatim, their substance was adequately covered in the trial court's oral charge to the jury. Powell v. State, 51 Ala.App. 398, 286 So.2d 73, 75 (Ala.Cr.App. 1973), cert. denied, 291 Ala. 796, 286 So.2d 75 (Ala.1973). Therefore, any error was harmless and did not effect the appellant's substantial rights. Rule 45, Alabama Rules of Appellate Procedure. See also Johnson v. State, 497 So.2d 600, 601-02 (Ala.Cr.App.1986).

VII
The appellant argues that the trial court's statement to the jury, that capital murder would involve the intentional killing of the deceased by beating her with his fists, was a prejudicial comment as an expression of opinion about the evidence. During the trial court's oral charge to the jury, the court said the following:
"Now, those are my instructions to you and those are what the laws of this state say with respect to the various degrees of homicide that are submitted in this case, the highest degree, of course, being the capital murder offense, which would involve the intentional killing of the deceased by beating her with his fists during a time when he was committing a rape in the first degree, or an attempt thereof."
The capital offense in the instant case involves an intentional killing during the commission of a rape or an attempt thereof. The indictment charged that the appellant "did intentionally cause the death of April Denna Scott by beating her with his fists" while engaged in, or attempting to engage in, rape in the first degree. The appellant admitted beating the child with his fists. When viewed in the context of the entire charge, Cupp v. Naughten, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), it is clear that the trial judge did not inject his opinion about the evidence, but was summarizing his charge on the degrees of homicide involved in the present case.

VIII
The appellant argues that the trial court erred in combining intentional murder *208 and felony murder on one murder verdict form. The record indicates that the trial judge extensively instructed the jury on the difference between capital murder, felony murder, and intentional murder. Thereafter, in explaining to the jury the possible verdicts which could be rendered in this case and the verdict forms, he charged:
"In the event that you do not find him guilty of the offense of capital murder, that is, you are not convinced to the required degree that he is guilty of the offense, you examine the evidence in the case with respect to the lesser-included offenses that I have instructed you on, that is, what is referred to as straight murder or felony murder, and if you are convinced beyond a reasonable doubt that he is guilty of one of those offenses of murder, the form of your verdict would be, `We the Jury, find the Defendant, Darryl Eugene Freeman, guilty of murder.'"
Thus, the trial court explained to the jury that the murder verdict form was appropriate if the jury found the appellant guilty of either intentional murder or felony murder. The appellant has cited no case law holding that a trial court must submit separate verdict forms to the jury on intentional murder and felony murder. Because the jury was carefully charged on the difference between these two types of murder, as well as the distinction between these types of murder and the capital offense, the appellant was not prejudiced by combining the two types of murder on one verdict form.

IX
The appellant argues that the trial court erred to reversal in charging the jury on the definition of intent. The trial court instructed the jury as follows:
"THE COURT: ... How do you determine a person's intent? Sometimes that is difficult to do. Our courts have addressed that problem and that question. Of course, you cannot look into a person's mind and see what they intended. You must judge and determine what a person intended by what were the natural and probable consequences of what the person did. That is a factual question for the jury to determine, based on an examination of the evidence presented in the case. You must determine and decide what the person actually did, decide what were the resulting probable consequences, what was probably going to be the result of what the person did, and from that you determine what the intent of the person was. This is based on your determination of the known conscious acts of the person and the probable known consequences of those acts. The law must presume that a person intends the forseeable natural and probable consequences of what they do. That is a legal presumption." (Emphasis added.)
The appellant contends that, in making this legal presumption, the trial court shifted away from the State the burden of proof as to the issue of intent. The United States Supreme Court in Sandstrom v. Montanta, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), held that a jury instruction stating that, "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts," 442 U.S. at 515, 99 S.Ct. at 2454, constituted an unconstitutional, burden-shifting instruction. See also Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).
"The Due Process Clause of the Fourteenth Amendment protects against the conviction of an accused except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged. Franklin, 471 U.S. at 313, 105 S.Ct. at 1970; In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). A Sandstrom error in the jury instruction thus `remove[s] from the prosecution the burden of proving every element of the crime beyond a reasonable doubt.' Davis [v. Kemp ], 752 F.2d 1515, 1517 (11th Cir.) (en banc), cert. denied, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985)]."
Bowen v. Kemp, 832 F.2d 546, 548 (11th Cir.1987).
*209 The instant charge is "`virtually indistinguishable' from the one found to be constitutionally defective in Sandstrom." Burton v. Foltz, 810 F.2d 118, 121 (6th Cir. 1987), cert. denied, 484 U.S. 942, 108 S.Ct. 327, 98 L.Ed.2d 354 (1987). "[A] reasonable juror could have understood the challenged portions of the jury instruction in this case as creating a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent...." Francis, 471 U.S. at 325, 105 S.Ct. at 1977.
Even though the trial court erred in giving the above instruction, the appellant's conviction will be upheld if the error was harmless beyond a reasonable doubt. Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). The Supreme Court in a later case explaining Rose v. Clark, wrote:
"[T]he fact that the jury could conceivably have had the impermissible presumption in mind when it considered the element of malice was not a reason to retry the defendant if the facts that the jury necessarily found established guilt beyond a reasonable doubt. The Court said, `When a jury is instructed to presume malice from predicate facts, it still must find the existence of those facts beyond reasonable doubt. Connecticut v. Johnson, 460 U.S. 73, 96-97, 103 S.Ct. 969, 982-83, 74 L.Ed.2d 823 (1983) (Powell, J., dissenting). In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not intend to cause injury.' Id., at 580, 106 S.Ct., at 3107."
Pope v. Illinois, 481 U.S. 497, 107 S.Ct. 1918, 1922, 95 L.Ed.2d 439 (1987). "Rose requires an examination of the record as a whole to determine whether the evidence of intent is so dispositive that the `"reviewing court can say beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption."' [478 U.S. at 583] 106 S.Ct. at 3109." Hyman v. Aiken, 824 F.2d 1405, 1409 (4th Cir.1987).
The harmless error doctrine has been applied to a Sandstrom violation in two different situations:
"(1) where the erroneous instruction was applied to an element of the crime that was not at issue in the trial, or (2) where the evidence as to defendant's guilt was overwhelming. See Davis, 752 F.2d at 1521. See also Miller v. Norvell, 775 F.2d 1572, 1576 (11th Cir.1985), cert. denied, 476 U.S. 1126, 106 S.Ct. 1995, 90 L.Ed.2d 675 (1986); Thomas [v. Kemp, 766 F.2d 452, 455 (11th Cir.1985), vacated and remanded for further consideration, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986)]; Tucker v. Kemp, 762 F.2d 1496, 1501 (11th Cir.1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3340, 92 L.Ed.2d 743 (1986); Brooks v. Kemp, 762 F.2d 1383, 1390 (11th Cir.1985) (en banc), vacated and remanded for further consideration, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986)."
Bowen v. Kemp, supra, at 548-49. (Footnotes omitted.)
Thus, a determination must first be made as to whether intent was at issue in the present case. See Engle v. Koehler, 707 F.2d 241 (6th Cir.1983), aff'd, 466 U.S. 1, 104 S.Ct. 1673, 80 L.Ed.2d 1 (1984) (error not harmless when intent was contested); United States v. Crowder, 719 F.2d 166, 173 (6th Cir.1983), cert. denied, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984) (error harmless when instruction had "little or no application to any contested issue in the case"); United States v. Williams, 665 F.2d 107 (6th Cir.1981) (error not harmless when element of knowledge was contested); Logan v. Abshire, 778 F.2d 283 (6th Cir.1985), cert. denied, 484 U.S. 852, 108 S.Ct. 155, 98 L.Ed.2d 110 (1987) (harmless error where appellant admitted premeditation); Martin v. Foltz, 773 F.2d 711 (6th Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986), abrogated by, Merlo v. Bolden, 801 F.2d 252 (6th Cir.1986), cert. denied, 480 U.S. 909, 107 S.Ct. 1358, 94 L.Ed.2d 527 (1987) (harmless error where defense of non-participation was asserted); High v. Kemp, 819 F.2d 988 (11th Cir.1987) (intent in a death penalty case was never contested); Cook v. Foltz, *210 814 F.2d 1109, 1113 (6th Cir.1987), cert. denied, 484 U.S. 837, 108 S.Ct. 119, 98 L.Ed.2d 77 (1987) (appellant conceded the issue of intent). The appellant's defense at trial was simply that he did not intend to kill the victim. He failed to raise any defense of insanity[3] and admitted telling Officer Cox that he was "in his right mind" at the time of the offense and that he was "just mad." He admitted hitting the child five times with his fists, but claimed that he did not believe his acts would kill her.
"[A] Sandstrom error will not automatically be deemed harmful simply because a defendant raises a defense which contests the intent of the perpetrator. When such a defense is frivolous or wholly implausible, a Sandstrom error should be deemed harmless." Baker v. Montgomery, 811 F.2d 557, 558 (11th Cir.1987) (the appellant's defenses of provocation and self-defense were held "frivolous and wholly implausible" in light of the facts of the case). See Rose v. Clark, supra ("the fact that respondent denied that he had `an intent to do any injury to another,' does not dispose of the harmless error question").
Next the evidence presented at trial must be reviewed. However, "`we cannot infer overwhelming evidence of intent directly from the physical sequence that resulted in the victim's death. This court must also look at the evidence of defendant's state of mind.'" Dick v. Kemp, 833 F.2d 1448, 1453 (11th Cir.1987), quoting Bowen v. Kemp, supra, at 551. In so doing, we must distinguish findings of guilt from findings of intent. Id. "[W]e look at the evidence bearing on intent, which appears to require an awareness or understanding by the defendant that he is taking certain actions and that those actions are likely to cause death." Godfrey v. Kemp, 836 F.2d 1557 (11th Cir.1988).
There was no evidence produced at trial that would support the appellant's contention that he did not intend to cause the victim's death. In light of the fact that the appellant was a nineteen-year old male with a tenth-grade education, he must have been aware that repeatedly hitting a two-and-a-half year old child in the stomach and the head with his fists, causing her to fall to the floor and hit her head against a table, would have been likely to cause her death. This is further supported by the extent of the injuries suffered by the victim and the appellant's behavior in taking the paper towels outside following his acts, failing to tell Angela Scott that he had hit the child, and denying any knowledge of the victim's death when talking to the police at the hospital. In light of the overwhelming evidence of guilt in the case at bar, "no rational jury would need to rely on an erroneous presumption instruction," Rose v. Clark, 478 U.S. at 581 n. 10, 106 S.Ct. at 3108 n. 10, and the instruction constituted harmless error.
No objection was raised by defense counsel to this instruction. However, having determined that the error was harmless, we find that it was not plain error. The Alabama Supreme Court noted in Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985), cert. denied, Kennedy v. Alabama, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985), that "the plain error doctrine is one which this Court may apply if we find substantial prejudice, even though no objection was made at trial." (Emphasis provided.) In finding the trial court's instruction to be harmless error, we conclude that it was not a "`particularly egregious error' and would not result in a miscarriage of justice if a reversal was denied." Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), cert. denied, Womack v. Alabama, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See Cook v. Foltz, 814 F.2d 1109, 1111 (6th Cir.1987), cert. denied, 484 U.S. 837, 108 S.Ct. 119, 98 L.Ed.2d 77 (1987) (wherein the appellant failed to show sufficient cause for and prejudice from his failure to object, and thus his Sandstrom claim was barred from consideration). As noted by the Alabama Supreme Court in Ex parte Harrell, 470 So.2d 1309, 1313 (Ala. 1985), cert. denied, Harrell v. Alabama, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 *211 (1985), quoting 8B Moore's Federal Practice, § 52.02[2] (2d ed. 1984), if plain error did not "`"affect substantial rights" there would not be much point to [the rule]'" and "`the only consequence of finding a "plain" error would be that the court would "notice" it but not make it a basis for reversal.'"

X
In accordance with § 13A-5-53, Code of Alabama (1975), The record has been examined, including the guilt and sentencing proceedings, for any error which adversely affected the rights of the appellant and have found none.
The trial court found the existence of two aggravating circumstances: that the capital offense was committed while the appellant was engaged in or attempting to engage in a rape, § 13A-5-49(4), and that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, § 13A-5-49(8).
The appellant argues that the trial court erred in considering the capital offense to be especially heinous. In making this finding the trial court stated:
"The term `heinous' has been defined to mean extremely wicked or shockingly evil. Atrocious has been defined to mean outrageously wicked and violent. Cruel means designed to inflict a high degree of pain, with indifference to or even enjoyment of the suffering of others. However, it is not enough that a capitol felony be heinous, atrocious or cruel. It must be especially so, and in this case I find that it was especially so. I make that finding on the basis of the fact that the victim of this crime was a child approximately two and a half years of age, completely defenseless. The evidence presented supports a finding that the child was abused and violated sexually by this Defendant, a person that she knew and apparently trusted. The evidence indicates that this child was brutally and savagely beaten by the Defendant, to such a degree that she suffered multiple cerebral-facial injuries, including a large hematoma in her mid-forehead, multiple contusions of her cheeks, contusions and lacerations of her tongue, a large hemorrhage in the top of her skull, a bilateral subdural hematoma, a massive cerebral edema and lacerations to her frontal lobe. In addition to those facial injuries, she suffered massive blunt force trauma to her body, causing multiple contusions to her upper torso, a subcutaneous hemorrhage to her anterior torso, a contusion of her right lung, her thymus gland and her diaphragm, a crushing injury of the round ligament of her liver. She also suffered a hemorrhage to the body of her pancreas and a contusion of her spleen. She suffered injuries to her genitalia, consisting of a laceration of her hymen and a contusion of the external hymenal surface. That injury was described by the forensic pathologist, Dr. Agular, as massive, and, in addition, seminal fluid was found in the vaginal canal of this child and on two of the swabs that were submitted for examination. In short, her death was caused by multiple blunt force trauma to her head and body. She was beaten to death.
"By any standard acceptable to civilized society, this crime was extremely wicked and shockingly evil. It was perpetrated under circumstances which had to cause a high degree of pain to this child, and the evidence indicates that there was indifference on the part of this Defendant to that. In fact, the evidence indicates that after he had brutally beaten this child he placed her on a couch. Her neck was limp and her eyes rolled back in her head and she was moaning. Shortly after placing her on the couch she began to vomit, throwing up food that she had eaten for supper and throwing up blood. Instead of seeking medical attention or trying to aid this child, the Defendant simply cleaned up the expulsion from her body, deposited it in a garbage can in front of the house and went to sleep and allowed this child to die.
"While I recognize that all capital offenses are heinous, atrocious and cruel to some extent, the degree of heinousness, atrociousness and cruelty with regard to *212 this offense exceeds in my opinion that which would be common to all capital offenses."
The Alabama Supreme Court has held that this aggravating circumstance applies to those homicides which are unnecessarily torturous to the victim. Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981). This Court has recognized that the killing of an adult woman, when accomplished by physical beating and occasioned by sexual abuse, can meet this aggravating circumstance. See Julius v. State, 455 So.2d 975, 981-83 (Ala.Cr.App.1983), affirmed, 455 So.2d 984 (Ala.1984). Under the facts of this case, no error exists in the trial court's finding of this aggravating circumstance. For other cases finding this aggravating circumstance see Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980); Hubbard v. State, 500 So.2d 1204 (Ala.Cr.App.), affirmed, 500 So.2d 1231 (Ala.1986), cert. denied, Hubbard v. Alabama, 480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987); Boyd v. State, 542 So.2d 1247 (Ala.Cr.App.1988).
The trial judge found the existence of one statutory mitigating circumstance; the age of the appellant, § 13A-5-51(7). However, he noted in making this finding that the appellant's lifestyle was that of an adult in that he had been living with the victim's mother for seven months and his prior convictions indicated a lifestyle that "was less akin to the behavior of a teenager, but was more akin to the conduct of a seasoned criminal." He, therefore, held that the mitigating circumstance was not to be accorded much weight.
The appellant argues that the trial court erred in failing to find as mitigating circumstances that the appellant had no significant history of prior criminal activity, § 13A-5-51(1); that the offense was committed while the appellant was under the influence of extreme mental or emotional disturbance, § 13A-5-51(2); and that the capacity of the appellant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, § 13A-5-51(6). The trial court held that the appellant had a history of prior criminal activity that he considered to be significant. The trial judge stated, "I believe he has nine convictions in four years of offenses, three theft offenses, possession of marijuana, disorderly conduct, illegal possession of alcohol, assault in the third degree, another possession of marijuana, and a felony violation of the Alabama Uniform Controlled Substances Act." The trial court's written findings concerning the non-existence of this mitigating circumstance indicate that he considered two charges of theft of property in the third degree, a charge of shoplifting, and a charge of possession of marijuana, which were part of the appellant's juvenile record. Because juvenile adjudications are not convictions and are not criminal in nature, Baldwin v. State, 456 So.2d 117, 125 (Ala.Cr.App.1983), affirmed, 456 So.2d 129 (Ala.1984), affirmed, Baldwin v. Alabama, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985) and because only convictions can be considered to negate this mitigating circumstance, Cook v. State, 369 So.2d 1251, 1257 (Ala.1978), the trial court erred in considering these charges. However, the record further indicates that the trial judge also considered the appellant's forfeit of a cash bond on an underlying charge of disorderly conduct, a conviction for the illegal possession of alcohol, a conviction of assault in the third degree, a conviction of possession of marijuana, and a felony conviction of violating the Alabama Uniform Controlled Substances Act, which were committed by the appellant when he was an adult. Such a criminal record sufficiently negates this mitigating circumstance. Furthermore, in Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), the United States Supreme Court held that the application of harmless error to the weighing of aggravating and mitigating circumstances in a capital case was constitutional. In light of the appellant's criminal record as an adult and the trial court's consideration thereof, any error in the trial court's considering the appellant's juvenile record was harmless.
*213 Moreover, the trial court's findings were proper regarding the non-existence of the other two mitigating circumstances. In holding that the evidence did not support a finding that the appellant was under the influence of extreme mental or emotional disturbance, the trial court stated:
"[T]his Defendant was examined by Dr. Richard C. Keven, a licensed psychologist with the Huntsville-Madison County Mental Health Center, on February 29, 1984. As a result of that examination, Dr. Keven found that the defendant appeared to have no apparent thought or effective disorder, that his memory was precise and his concentration good. He also found that the Defendant was competent to stand trial and that there was no evidence available to the examiner which would call into question his responsibility for his actions at the time of the alleged offense."
At trial, the appellant disavowed any indication that he was angry at the victim's mother for going out; rather, he stated that he was angry because the victim was crying.
The trial court found the nonexistence of the mitigating circumstance concerning the capacity of the appellant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, stating:
"I am not satisfied from the evidence offered in support of that claim that that was the case. The only evidence on that subject is that the Defendant says he doesn't know why he did it. I'm not satisfied that that statement alone is sufficient to invoke the mitigating circumstance, especially in view of the fact that the Defendant was examined for mental problems relating to this offense and no such problems were found."
Although there was testimony that before killing the victim, the appellant drank two or three beers and smoked one or two joints of marijuana during the day, the appellant testified that he was not drunk when he arrived at Angela Scott's house. Angela Scott testified that the appellant did not appear intoxicated when she arrived home. The appellant's mother and sisters testified that he had never shown any sign of abnormalities. There was no claim by the appellant that he was under the influence of alcohol or marijuana when he committed the offense.
The trial court stated that he considered the non-statutory mitigating circumstances suggested by defense counsel, but that he found them to be nonexistent, as he had already found the facts of the offense to be especially heinous, atrocious, and cruel. He further noted that he had considered the character evidence presented in the pre-sentence report and, that, as to the claim that the appellant was remorseful, he had also considered the evidence presented and rejected that contention. Thus, the trial court considered the non-statutory mitigating circumstances. Ex parte Cochran, 500 So.2d 1179, 1187 (Ala.1985), on remand, 500 So.2d 1188 (Ala.Cr.App.), affirmed, 500 So.2d 1064 (Ala.1986), cert. denied, Cochran v. Alabama, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).
Despite the appellant's argument to the contrary, the trial court gave sufficient consideration to the jury's recommendation of life without parole. According to § 13A-5-47(e), Code of Alabama (1975):
"(e) In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to section 13A-5-46(a) or 13A-5-46(g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."
The trial court and not the jury is the sentencing authority. Beck v. State, 396 So.2d 645 (Ala.1980), superceded by, Magwood v. State, 548 So.2d 512 (Ala.Cr.App. 1988). See also § 13A-5-47, Code of Alabama (1975). The trial court is authorized to reject the jury's recommendation of life without parole when imposing sentence and to impose a death sentence. Tarver v. *214 State, 500 So.2d 1232 (Ala.Cr.App.1986), aff'd, 500 So.2d 1256 (Ala.1986), cert. denied, Tarver v. Alabama, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). The trial judge's findings clearly showed that he considered the jury's advisory verdict.
The trial judge's findings regarding the mitigating and aggravating circumstances are supported by the record. The trial court found that the aggravating circumstances outweighed the mitigating circumstance. The independent weighing of the aggravating and mitigating circumstances supports the trial court's conclusion and indicates that death was the proper sentence. No evidence exists that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.
The sentence of death in this case is not disproportionate to the penalty imposed in similar cases, considering the crime and this appellant. See Bradley v. State, 494 So.2d 750 (Ala.Cr.App.1985), aff'd, 494 So.2d 772 (Ala.1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987) (rape-murder); Dunkins v. State, 437 So.2d 1349 (Ala.Cr.App.), aff'd, 437 So.2d 1356 (Ala.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984) (rape-murder).
We have carefully searched this record for plain error and have found none. Therefore, the judgment of conviction and the sentence of death are proper, and they are affirmed.
APPLICATION GRANTED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
All the Judges concur.

ON APPLICATION FOR REHEARING
McMILLAN, Judge.
The appellant argues that this cause should be reversed because he says the striking by the prosecutor of three black veniremen from the jury violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). However, as argued by the State, there is no indication in the record that there were any blacks on the venire, or that any blacks were struck by the State.
"Although the record does show that the defendant is black and the victim was white, it does not show that the state exercised any of its peremptory challenges to remove prospective black jurors from the venire. The record as a whole simply does not raise an inference that the state was engaged in the practice of purposeful discrimination. Under the plain error rule this Court will `notice any plain error in defect, in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner." (Emphasis added.) Rule 39(k), [Ala.R.App.P.]. The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred (i.e., the state's use of its peremptory challenges to exclude blacks)."
Ex parte Watkins, 509 So.2d 1074, 1076-77 (Ala.1987).
Although the appellant argues that his jury strike list is evidence of discrimination, the list appears only as an exhibit to the trial court's denial of the appellant's Rule 10(f), Ala.R. of App.P., motion to supplement the record and therefore should not be considered on appeal. Although the abbreviations "W" or "B" appear to be written in beside the typed names of the potential jurors, these are only the assertions of the defense counsel, and, because they are not supported by the record, they will not be considered on appeal. Anderson v. State, 455 So.2d 957 (Ala.Cr.App.1984); Gothard v. State, 452 So.2d 889 (Ala.Cr.App.1984); Allen v. State, 382 So.2d 1147 (Ala.Cr.App.), writ denied, 382 So.2d 1158 (Ala.1980). As the trial court noted during the hearing on the appellant's Rule 10(f) motion, no record exists of the attorneys' voir dire examination. *215 Therefore, this issue is not properly before this court.
OPINION EXTENDED; APPLICATION OVERRULED.
All Judges concur.
NOTES
[1] After making this statement, the appellant was charged with murder rather than with capital murder, as the test results on the genital injuries were not yet known.
[2] Although in arguing this issue the appellant alleges that he, a black man, was tried by an entirely white jury, the record is devoid of any such evidence.
[3] Although he originally entered a plea of not guilty by reason of insanity, the plea was withdrawn before trial. He was however examined by a psychiatrist before dropping his plea.